179 So. 306

**ENGLISH v. BLACKMAN et al.**

No. 34677.

Feb. 7, 1938.

McBride & Goff, of Ruston, for appellant English.

Wilkinson, Lewis & Wilkinson, George T. Naff, and R. L. Benoit, all of Shreveport, and Goff & Goff, of Arcadia, for appellees G. G. Nesbitt, Jr., and others.

ODOM, Justice.

Plaintiff is the owner of the W.½ of the W.½, Sec. 24, T. 21 N., R. 5 W., in Claiborne parish. On May 12, 1925, he sold to G. G. Nesbitt one-fourth of the minerals in and under the S.W.¼ of the N.W.¼ of that section. On May 14, 1925, he sold to G. G. Nesbitt one-fourth of the minerals in and under the W.½ of the S.W.¼ of that section, and on August 3, 1925, he sold to J. H. Brown one-fourth of the minerals in and under the W.½ of the N.W.¼ of the same section. These servitudes covered the entire W.½ of the W.½ of Sec. 24.

By mesne conveyances Nesbitt and Brown conveyed to others a portion of the mineral interests acquired by them, so that, at the date of the filing of this suit, which was February 25, 1937, the following named persons and corporations owned interests in the servitudes: Southland Royal-

ty Company, G. G. Nesbitt, Jr.; Trinity Royalty Company, Inc.; Acme Land & Investment Company, Inc.; J. H. Brown, J. J. McClelland, Frank B. Treat, Otis C. Poole, Fred L. Smith, trustee, and Stewart S. Hunt—all made defendants in the suit.

The purpose of the present suit is to have canceled and erased from the records the servitudes granted by English in 1925, on the ground that there has never been any development of the land for the production of oil, gas, or other minerals, and that said servitudes for that reason are prescribed or extinguished because of nonusage for a period of ten years, as provided in article 789 of the Revised Civil Code.

It is admitted by all defendants that the servitudes were never developed. Their main defense is that, on July 5, 1932, the plaintiff landowner and those who held interests in the servitudes which he had granted in 1925 made a joint oil and gas lease, covering the W.½ of the W.½ of Sec. 24, to O. G. Collins, said lease having a primary term of ten years, and that the fact that English, the landowner, joined the owners of the royalty interests in this lease indicated a purpose and intent on his part to interrupt the running of prescription in his favor; that the execution by English of the 1932 lease, which by its terms extended beyond the date on which the servitudes previously granted expired, was not only an acknowledgment of the existence of the rights of the owners of the servitudes granted in 1925, but in fact was a consent that they have further time within which to exercise their rights. In

support of this contention they cite and rely on the case of Mulhern v. Hayne et al., 171 La. 1003, 132 So. 659.

The defendants Stewart S. Hunt and Otis C. Poole in their answers reiterated and adopted the defenses set up by the other defendants, and, in addition thereto, alleged that they purchased their interests in the minerals from R. L. Benoit long after the execution of the 1932 lease; that said lease had been on the public records for several years when they purchased; and that their investigation showed that the landowner had received his pro rata of the rentals under said lease and that they purchased on the advice of counsel that their title would be valid. Their plea is that, as to them, plaintiff is estopped from claiming that the servitudes have expired.

All the defendants pleaded estoppel against plaintiff on the ground that he accepted rentals under the 1932 lease subsequent to the dates on which the original servitudes would have prescribed, if not interrupted.

There was judgment in the trial court in favor of plaintiff, ordering canceled the 1925 servitudes in so far as all of the defendants except Hunt and Poole were concerned. All the defendants except Hunt and Poole appealed, and plaintiff appealed in so far as the judgment was in favor of Hunt and Poole.

It is admitted that the rights acquired under the servitudes granted by English, the landowner, in 1925 were not exercised. These servitudes have therefore expired by limitation unless English has, in some

manner recognized by law, interrupted the running of the ten-year prescription liberandi causa. Defendants argue that he has done that in two ways: First, by joining the royalty owners in making a new lease on the same land on July 5, 1932, which by its terms will expire long after the end of the ten-year prescription period applicable to the servitudes granted in 1925. In support of that defense they cite the Mulhern Case, supra, which we reaffirmed in the case of Bremer v. North Central Texas Oil Company, 185 La. 917, 171 So. 75, 76. And, second, by accepting benefits under the 1932 lease.

■■■■ If in fact English, who granted the 1925 servitudes, voluntarily joined the holders of mineral interests under those servitudes in making the 1932 lease, which by its terms, if kept alive by the payment of the specified rentals, would expire long after the end of the ten-year prescription period applicable to the 1925 servitudes, that was an acknowledgment of the existence of the rights of his colessors and indicates that he intended ·to interrupt the running of the prescription which he now pleads. That, as we said in the Bremer Case, is what was held in Mulhern v. Hayne, supra. In the Bremer Case, however, we made it clear that it was the view of every member of this court that article 3520 of the Civil Code, which says that prescription ceases to run whenever the debtor or possessor "makes acknowledgment of the right of the person whose title they prescribed," does not mean that a mere acknowledgment of the existence of the rights of those in whose favor the servitude runs, interrupts prescription. We said:

"There must be more than a bare acknowledgment; the acknowledgment must be accompanied by or coupled with 'the purpose and intention of the party making the acknowledgment to interrupt the prescription then running.'"

We cited the case of Frost Lumber Industries v. Union Power Company, 182 La. 439, 162 So. 37, 40, where we said:

"As pointed out in the Lewis Case [167 La. 1067, 120 So. 859], there must be coupled with the acknowledgment the purpose and intention of the party making the acknowledgment to interrupt the prescription then accruing."

In the case of Kennedy v. Pelican Well Tool & Supply Company, La.Sup., 178 So. 359, 361, decided Monday January 10, this year, we said of the Mulhern Case:

"In the Mulhern Case it was the intention of the parties to sign a joint lease, which was signed by all of the parties at the time of the confection of the lease."

In this recent case we reaffirmed the rulings made in both the Bremer and the Frost Lumber Industries Cases, supra.

The law applicable to the case at bar in so far as · the main defense is concerned is clear. So that the only question to be decided is whether English, by executing the 1932 lease, intended to interrupt the running of the prescription which he now pleads.

■■■■ Under the facts disclosed, we find and hold that he did not. · The 1932 lease

is made to O. G. Collins and is dated July 5. A photostatic copy of the lease is in the record. The names of the lessors written in the caption are: S. M. English, R. L. Benoit, J. J. McClelland, G. G. Nesbitt, Jr.; R. O. Roy, Trinity Royalty Company, Inc., by A. J. Hodges, president; Frank B. Treat, and Southland Royalty Company, by S. A. Dellaplain, vice president. Each of these signed the lease, as did O. G. Collins, the lessee. The lease is a private act, written on a printed form, and was proved by one of the witnesses.

Collins, the lessee, testified that he was interested in "getting a block" or "blocking up" the territory in the vicinity of Mr. English's land for the purpose of getting it developed for minerals, and that he interviewed Mr. English and asked him for a lease, and that he agreed to put his land in the "block." Collins said he knew that the English land was already burdened with servitudes and knew that those interested in them would have to sign the new lease, and that he so informed Mr. English. Collins says he prepared the lease, wrote into the caption as lessors not only the name of English but the names of all the others which now appear therein, and that all those names were in the instrument at the time Mr. English signed it on July 5.

But Mr. English vehemently denied all this. He said that Mr. Collins said nothing to him about the necessity of getting the others to join him in making the lease and that he had no knowledge from any other source that they intended to do so.

He further testified emphatically that, when he signed the lease, no other names appeared therein as lessors.

So the testimony of Mr. English and Mr. Collins is in hopeless conflict. After reading the testimony and examining the documents filed in evidence, our conclusion is that Mr. Collins is mistaken on both points. And here we take occasion to say that we attribute his mistakes to a faulty memory and confusion and not to an intent to mislead the court, for, so far as the record discloses, he has no interest in the lease or the outcome of this litigation. He testified that in making up the block he took about 60 similar leases, which involved a vast amount of labor and research in getting not only the names of landowners but the names of all those who, according to the records, held interests in prior mineral grants.

The sincerity of Mr. English is questioned by counsel for defendants because he is interested in the litigation. It is no doubt true that financial interest does sometimes "warp men from the living truth." But the testimony of Mr. English is so corroborated as to induce the belief that he was not "warped" on this occasion.

Collins took similar leases about the same time from Patton, Reynolds, and Meadows. Patton says that Collins did not mention mineral owners to him until he, Patton, brought up the subject. Reynolds and Meadows both say that Collins did not tell them that he was going to get the holders of mineral rights to sign the

leases they gave, and that the other names were inserted after they signed.

That Mr. Collins did write into the English lease contract some of the names after Mr. English signed appears certain to us. A photostatic copy of that instrument is before us. It shows the names of J. H. Brown and Nellie Norton written in and erased by drawing horizontal lines through them. These two persons owned, according to the notarial records, interests in the 1925 servitudes. Mr. Collins says that in making up this lease he got the names of those who held the mineral rights under the servitudes from Fortson, who owned a set of abstract books. The notarial records show, according to certified copies of deeds filed in evidence, that J. H. Brown sold to Frank B. Treat his interest in these minerals on July 25, 1932, 20 days after the date of the lease (July 5), and Collins says that English signed the lease on the day of its date. The name Frank B. Treat was written into the lease as one of the lessors by Collins. It is certain that Treat's name was not in the lease when English signed it on July 5, because he did not acquire his interest until 20 days later, and Collins says he got the names of the owners of the mineral rights from the records.

The records show also that Nellie Norton owned an interest in the mineral rights and that she transferred that interest to R. O. Roy on May 9, 1932. But the act of transfer was not filed for record until July 16, 11 days after English signed the lease, and was not recorded

until July 25. The name of R. O. Roy also was written into the lease by Collins as one of the lessors. Clearly the names of Frank B. Treat and R. O. Roy were written into the instrument to take the place of the names of J. H. Brown and Nellie Norton, both of which were erased. Collins admits that he wrote the name of the Southland Royalty Company, one of the lessors, into the lease after English signed it. It is therefore too clear to admit of argument that the instrument was altered after English signed it.

All this so strongly corroborates the testimony of Mr. English that we must believe him when he says that no name except his own was written in the instrument as lessor when he signed.

Collins says that English signed the instrument on July 5. Just when the others signed is not shown. After English signed, the document was taken by Collins and either carried or sent to the others for their signatures. It is certain that the parties did not sign the lease in the presence of one another. The document was proved by one of the witnesses before a notary on August 1, 1932.

Mr. English testified that he had never had any agreement with the others with reference to this lease; that there was never any consultation between him and any of them. At the beginning of the trial, plaintiff called the defendants on cross-examination. Only two of them, Benoit and Nesbitt, answered. Benoit testified that he was not personally acquainted with Mr. English and, as far as

he knew, had never seen him. He was asked whether he had ever had any conversation with Mr. English relative to the execution of this lease, and he said: "unless possibly my memory serves me incorrectly, I have never seen Mr. English."

Mr. Nesbitt testified that he knew Mr. English. He was asked where he was when he signed the instrument and said he did not know. Asked whether he signed the lease in the presence of Mr. English, he said: " I don't believe that I did." The other defendants called for cross-examination did not answer. Counsel for defendants made no attempt to account for their absence.

This was not, therefore, a joint lease, and the mere signing of it by Mr. English did not indicate that he intended to recognize the rights of the others and certainly did not indicate that he intended to interrupt the running of prescription.

As further indication that Mr. English did not intend to interrupt the running of prescription, on July 2, 1935, he wrote the United Gas Public Service Company, the owner of the mineral rights under the servitude, that "The minerals is out of date in 1935, so if your will pay me twenty-five dollars ($25.00) it will be extended to 1936."

In reply to this letter the United Gas Public Service Company wrote him on July 10, calling his attention to the 1932 lease signed by him and the others, and said:

"This was a joint contract signed by all parties and from the face of it, it would appear that you are recognizing the interests of the various parties signing. If you can secure a disclaimer of title from these parties, we will be glad to change our records to show you as owning the entire mineral interest, but until you do so, we will be compelled to pay these people delay rentals under the terms of the lease."

This ended the correspondence, so far as the record discloses. Thereafter, the company sent to English not all, but his pro rata share of the rentals under the 1932 lease, which share of the rentals he accepted.

Now, it is argued that his acceptance of these rentals after the company had called his attention to the 1932 lease "is a barrier which prevents the acceptor, 'in the same breath,' to deny their existence." And counsel cite the case of White v. Ouachita Natural Gas Company, Inc., 177 La. 1052, 150 So. 15, 17, in support of their argument.

In the White Case, as in this one, the suit was to cancel a lease or servitude because it had prescribed. Several points were involved, but, as to whether it had expired, it appeared that A. L. Smith, who sold to the plaintiff the particular land sought to be cleared of the lease, had been using gas from the wells drilled under the lease, and we said:

"But the agreement between H. H. Nolan, then owner of the land, and the heirs of A. L. Smith, and the continual use by Smith and his assigns of the gas produced from other wells on the leased land, was a constant interruption of the

prescription; and indeed Nolan actually stipulated for and accepted the benefits of the lease. This was therefore as full and complete an acknowledgement of the lease as could be wished for; and, being in writing, would have been sufficient to take the lease out of prescription, even if prescription had already run."

The benefits of that lease were accepted before the end of the ten-year prescriptive period, or before prescription had accrued, and we said that the acceptance of them "was a constant interruption of the prescription."

The case at bar is different. When English accepted the benefits referred to, the servitudes which he granted were already prescribed. Since they had not been exercised and the running of prescription against them had not been interrupted within the ten-year period after their execution, they expired, became extinct. They were dead things, and the mere acceptance of the benefits of the new lease thereafter did not resurrect them. Accrued prescriptions cannot be "interrupted," of course.

As to the interest in these mineral servitudes now claimed by Stewart S. Hunt and Otis C. Poole, what we said as to the rights of the other defendants does not apply. Hunt and Poole were not parties but strangers to the 1932 lease. They were third parties who bought on the faith of the public records and after ascertaining that Mr. English had accepted benefits under that lease. On December 31, 1936, more than four years after the 1932 lease was executed and recorded in

the notarial records of the parish, R. L. Benoit, one of the lessors, sold to Stewart S. Hunt $\frac{1}{12}$ of the minerals in the W.$\frac{1}{2}$ of the N.W.$\frac{1}{4}$ of Sec. 24, T. 21 N., R. 5 W., and on January 6, 1937, Hunt sold to Otis C. Poole $\frac{1}{24}$ of the minerals in the same land. These purchases were made after their counsel had investigated the notarial records of the parish and had also ascertained that English had accepted his pro rata share of the rentals, under the 1932 lease, after 1935, or more than 10 years after the old servitudes were granted. He found of record the 1932 lease, which on its face showed that English had apparently joined Benoit and others in making the lease. Up to that date no attack had been made on that lease. According to the Mulhern Case, supra, the fact that English, the landowner, apparently joined the others in making the lease indicated that he not only had recognized their rights, but had consented to an interruption of prescription. Counsel therefore advised these parties that they would be safe in purchasing, especially in view of the fact that English had accepted the rentals, which indicated that he recognized the rights of Benoit and the others.

The cases of Braswell et al. v. Columbia County Development Company et al., 153 La. 691, 96 So. 534, 535, and Baird v. Atlas Oil Company, 146 La. 1091, 84 So. 366, 369, are in point.

In the Braswell Case, this court said:

"A third person purchasing, on the faith of the public records, the second mineral lease on property already incumbered with

a prior recorded lease, is only required to ascertain if the recorded owner of the first lease had made payments necessary to keep it alive, as such privilege is alone.enjoyed by him, as far as third persons are concerned." (Citing Baird v. Atlas Oil Company, supra.)

In the Baird Case, it was said:

"Therefore, when plaintiff's vendor, Len T. Langston, came to purchase the second mineral lease on the property in question, he was only required to ascertain if the Consolidated Progressive Oil Corporation, the owner, according to the records, of the first lease, had made the payments necessary to keep it alive."

These cases clearly hold that one dealing in mineral leases or mineral rights is required to look only to the public records and to ascertain whether the rentals stipulated in the leases have been paid. If the records show the ownership and if, on investigation, it is found that the lease has been kept alive by the payment of the rentals, a purchaser is protected.

In the case at bar the notarial records show that Benoit owned an interest in these minerals, and on investigation it was found by counsel that Mr. English had accepted benefits under the 1932 lease, which indicated that he not only had recognized the interest of his apparent co-lessors, but had apparently intended to interrupt the running of prescription. We think, under the circumstances, Hunt and Poole obtained good titles.

For the reasons assigned, the judgment appealed from is affirmed.

LAND, J., recused.

HIGGINS, J., absent.