193 So. 570

**GAILEY et al. v. McFARLAIN et al.**

No. 35320.

Jan. 9, 1940.

Bert Flanders, Jr., of New Orleans, W. D. Gordon, of Beaumont, Tex., and Plauche & Plauche, of Lake Charles, for plaintiffs and appellants.

Herold, Cousin & Herold, of Shreveport, Pujo, Hardin & Porter, of Lake Charles, Pugh & Buatt and Bruner & Chambers, all of Crowley, and Cline, Thompson, Lawes & Cavanaugh and Liskow & Lewis, all of Lake Charles, for defendants and appellees.

HIGGINS, Justice.

The plaintiffs, claiming the ownership of the mineral rights in and to a certain ten acre tract of land, under a mineral deed dated July 20, 1926, executed by Robert McFarlain, the owner of the fee title to the land in question, instituted this suit against Robert McFarlain and the various royalty owners, who derived their interests from McFarlain.

The defendants, averring ownership in themselves, denied that the plaintiffs were the owners of the mineral rights in and to the ten acre tract of land. They pleaded ten years prescription, liberandi causa, under Articles 789 and 3546 of the Revised Civil Code. Plaintiffs rejoined, stating that there was an obstacle in the form of prior recorded mineral leases, which suspended prescription, as expressly stated in Article 792, Revised Civil Code. Defendants replied that the leases were not such an obstacle as contemplated by Article 792, Revised Civil Code, and further defended on the ground that the plaintiffs had acquiesced in the leases by demanding and accepting portions of the rentals from the mineral lessees.

There was judgment maintaining the plea of prescription of ten years, liberandi causa, and rejecting the plaintiffs' demands in toto. The plaintiffs appealed,

The facts in the case are as follows: Robert McFarlain was the owner of the ten acres of land in question, including all of the mineral rights thereunder. On September 26, 1922, he conveyed to Louis Fontenot one-half of his mineral rights in and to the land. On April 20, 1926, McFarlain granted the same Louis Fontenot an exclusive mineral lease covering his remaining one-half of the mineral rights in the ten acre tract in question. Prior to that time, Louis Fontenot had assigned a part of his mineral servitude to Dr. G. A. Lillie, who, subsequent to April 27, 1926, also granted the same Louis Fontenot a mineral lease covering the mineral interest which Dr. Lillie had previously acquired from Fontenot. On May 18, 1926, Louis Fontenot granted a mineral lease covering the mineral interest remaining in himself to J. A. Rush, and on the same day, also assigned to Rush the two mineral leases, which he had obtained from McFarlain and Dr. Lillie. All of these instruments were properly recorded and were in full force and effect when the mineral deed dated July 20, 1926, under which the plaintiffs are claiming the ownership of the mineral servitudes on the property, was executed by Robert McFarlain.

The mineral deed executed by Robert McFarlain on July 20, 1926, hereinafter referred to for convenience as the Triche

deed, which is the key instrument in this controversy, was in favor of Charles W. Triche, Frank B. Jaenke, Mrs. Ann H. Hebert, Alfred T. Maund and W. D. De-Gravelle. In this instrument, Robert McFarlain "granted, bargained, sold, assigned, conveyed, set over and delivered with all legal warranties," unto the above named grantees, for the sum of $500 cash, or $50 per acre, the following:

"All and singular, the right, title, interest and ownership of the vendor, warranted to be not less than one-sixteenth of the whole, in and to all metals and minerals and metal and mineral rights whatsoever, in, to, under, upon, and in connection with, the following land belonging to said vendor and situated in Acadia Parish: (A description of the property follows.)

"And in addition to the above, the said McFarlain grants unto the said purchasers, and their heirs, successors and assigns, the right of ingress and egress to and from said land, and the necessary possession and use thereof, in order to avail themselves freely of the right hereby granted to take and take care of the metals and minerals, which include oil, petroleum, gas, etc., hereinbefore referred to.

"To have and to hold said property unto said purchasers and their heirs and assigns forever. And the said vendor moreover transfers unto the said purchasers all rights and actions of warranty to which he is (they are) entitled against all former owners and proprietors of the said property herein conveyed, subrogating the said purchasers to the said rights and actions

to be enjoyed and exercised as they might have been by the present vendor."

Certificates in the name of the owner showing no encumbrances were expressly waived by the parties and the deed was properly registered on July 30, 1926.

The Triche deed did not make any mention whatsoever of either the prior sale of one-half of the minerals in 1922 to Louis Fontenot, or the pre-existing exclusive mineral leases covering the mineral rights hereinabove set forth.

After the Triche deed was executed on July 20, 1926, J. A. Rush, the then owner of the pre-existing recorded mineral leases, assigned, under date of August 25, 1926, all of the mineral leases on the ten acre tract in question to the Rio Bravo Oil Company and the Marland Oil Company of Texas, which companies retained ownership of the leases until they expired by their terms in 1931. The leases were kept in effect by the payment of rental charges and not by any drilling operations on the property.

On May 24, 1935, Robert McFarlain and his wife leased, exclusively, the ten acre tract described in the Triche deed and other lands to W. B. Conover. Drilling operations on the ten acre tract described in the Triche deed were commenced by Glassell & Glassell, the assignees of Conover, on April 30, 1937, and resulted in the production of oil on or about June 21, 1937.

On October 11, 1937, the plaintiffs, some of the original grantees in the Triche deed of July 20, 1926, and their successors in title, brought this action against the defend-

ants, claiming title to all of the mineral rights in the property.

The first issue herein relates to the ownership of the reversionary interest to one-half of the minerals, which was outstanding at the time the Triche deed was executed on July 20, 1926. Plaintiffs contend that by virtue of the warranty and other provisions, both expressed and implied by law, in the Triche deed of July 20, 1926, there was either a sale in praesenti of McFarlain's reversionary interest in the right to one-half of the mineral interests then outstanding in Louis Fonteriot and Dr. Lillie, or, at least, that the outstanding right to half of the minerals accrued to the grantees of the Triche deed or their successors in title, when the mineral rights or servitudes lapsed and reverted to Robert McFarlain on September 26, 1932, or, at the latest, when Fontenot and Dr. Lillie executed the releases thereto in 1935 and 1937.

It is clear that the reversionary mineral interest of the owner of the fee simple title is "a certain object," which can be legally sold.

In Professor Harriet Spiller Daggett's recent work, "Mineral Rights in Louisiana," on pages 42 and 43, it is stated:

"It would appear, however, from this history that an owner of mineral rights can deal with his 'reversionary' hopes of servitude lapsed for non-user before their revestment; and there seems to be no good reason why he should not deal with this right under Articles 2450 and 2451 of the Civil Code, or by a converse analysis under Article 747."

Article 2450 and 2451 of the Civil Code plainly state that the sale of a hope is valid. These Articles read as follows:

"2450. A sale is sometimes made of a thing to come: as of what shall accrue from an estate, of animals yet unborn, or such like other things, although not yet existing."

"2451. It also happens sometimes that an uncertain hope is sold; as a fisher sells a haul of his net before he throws it; and, although he should catch nothing, the sale still exists, because it was the hope that was sold, together with the right to have what might be caught."

In the case of Gayoso Company, Inc., v. Arkansas Natural Gas Corporation et al., 176 La. 333, 145 So. 677, 679, this Court held valid a mineral lease granted by the land owner eight and one-half years after all of the same minerals had been sold by the land owner to a third person. The Court said:

"In our view none of these results follows the granting of the lease, as a matter of course, while the reservation was in force. There was nothing unusual or out of place in Ashley's doing what he did. At the time Ashley, it is true, granted the lease, he had not the mineral rights to the land to lease, but the moment the reservation would expire. the mineral rights would revert to Ashley's lessee by virtue of the. lease."

See also St. Landry Oil & Gas Co., Inc., v. Neal et al., 166 La. 799, 118 So. 24.

Was the reversionary mineral interest of McFarlain sold in praesenti in the deed of July 20, 1926?

It is noted that the language of the Triche deed does not expressly state that McFarlain is selling and Triche and his co-purchasers are buying the reversionary interest in the mineral rights. If this reversionary interest were one of the "certain objects" of the sale or grant creating the mineral servitude, it must be implied from the general language contained in the act of sale.

Counsel for the plaintiffs argue that the wording of the deed is all inclusive and, further, that any ambiguities are construed against the seller under the provisions of Article 2474 of the Civil Code.

The attorneys for the defendants contend that the general wording of the act of sale is limited and restricted by the express wording that the rights, title, interest and ownership of the vendor are "warranted to be not less than one-sixteenth of the whole," in and to the mineral rights whatsoever, and that, as the act of sale created a mineral servitude, in case of doubt as to the extent of the servitude or the manner of using it under the provisions of Article 753 of the Revised Civil Code, the uncertainty is resolved in favor of the owner of the property to be affected.

The very fact that the vendor warranted his rights, title and ownership to be "one-sixteenth of the whole," clearly shows that the purchasers were actually apprised of the fact that McFarlain's ownership was limited. This limitation, of course, was necessary because of the previous sale of one-half of the mineral rights to Louis Fontenot on September 26, 1922, and the leasing of the other half of the mineral rights to him on April 26, 1926. This lease, which was recorded, provided that McFarlain was to receive one-eighth of one-half, or a one-sixteenth, royalty interest in all minerals produced. This explains why the one-sixteenth warranty provision was placed in the Triche deed. If McFarlain proposed to sell and the purchasers in the Triche deed intended to buy the whole of the mineral rights in the ten acres, what reasonable explanation can be offered for the use of the words "warranted to be not less than one-sixteenth of the whole"? This clause shows, without doubt, that the purchasers not only knew that McFarlain did not own the right to all of the minerals under the tract of land in question but, also, that the warranty of his interest and ownership sold was limited. If the purchasers contemplated buying and the vendor intended to sell all or the whole of the mineral rights in this land, this restrictive clause would not have been placed in the act. Nowhere in the Triche deed does it appear by express provision that McFarlain intended to sell or Triche et al. intended to purchase McFarlain's reversionary interest in the mineral rights then owned by Louis Fontenot and which mineral rights would vest in McFarlain as the owner of the land, only if Fontenot failed to exercise his rights within ten years from September 26, 1922. It is also significant that in all of the mineral deeds by the original grantees in the Triche deed to their respective purchasers, and there were a number of these sales, in not one instance is there any express provision or clause which would indicate that any of these parties, most of whom are now plaintiffs,

ever claimed that the reversionary interest of McFarlain to the mineral rights granted to Louis Fontenot was intended to be covered and conveyed. If the purchasers in the Triche deed thought that they were buying the reversionary interest of McFarlain, certainly there would have been some express declaration on their part to this alleged ownership during the ten years that lapsed from the time they made the alleged purchase thereof, but the fact remains that there was not the slightest intimation thereof until the present suit was filed on October 11, 1937.

There was nothing in McFarlain's conduct from which it might be reasonably inferred that he intended to convey his reversionary interest. On the contrary, it appears that he executed a mineral lease in favor of W. B. Conover on May 24, 1935, covering this tract of land and including the mineral rights which reverted by Fontenot's nonuser on September 26, 1932, and recorded the same in Book X-5, pages 410–411 of the records of Acadia Parish, La. None of the plaintiffs made any protest against McFarlain and Conover thus treating the mineral rights as their property. In fact, there was no objection made by plaintiffs to the assignment of the lease by Conover to Glassell & Glassell on April 22, 1937. This document was also recorded.

█ It is our opinion that there was no sale or grant in praesenti of McFarlain's reversionary mineral interest in the Triche deed dated July 20, 1926.

Are the plaintiffs entitled to the benefit of accretion by virtue of the Triche deed, under the law?

It is said that the wording of the act of sale is so comprehensive and inclusive that the reversionary interest of McFarlain to the mineral rights previously granted to Fontenot was included as one of the objects of the sale to the purchasers in the Triche deed and, therefore, when Fontenot's mineral rights lapsed by nonuse of ten years, these mineral rights vested in the purchasers or grantees in the Triche deed under the law of accretion. In support of this contention, the following authorities are cited: McGuire v. Amelung et al., 12 Mart., O.S., 649; O'Brien's Heirs v. Smith, 16 La. 94; Noulen v. Perkins, 3 Rob. 233; Zunts v. Courcelle, 16 La.Ann. 96; Rapp v. Lowry, 30 La.Ann. 1272; Succession of Dupuy, 33 La.Ann. 277; Benton v. Sentell, 50 La.Ann. 869, 24 So. 297; Wolf v. Carter et al., 131 La. 667, 60 So. 52; and St. Landry Oil & Gas Co., Inc., v. Neal et al., 166 La. 799, 118 So. 24.

We have already shown that McFarlain's reversionary interest in Fontenot's mineral rights or servitude was not conveyed to the purchasers in the Triche deed. Since the grantees or the purchasers in the Triche deed and their vendees or assignees were not the owners of McFarlain's reversionary interest, because it was never intended by the parties that this "certain object" would be included in the sale or grant, there could be no legal reason why the Fontenot mineral rights, which lapsed for nonuse, should vest in the Triche deed purchasers or grantees, because, under the law, these mineral rights would revest in McFarlain, who was still the owner of the fee simple title and the reversionary mineral interest, as an incident thereto. . .

The above referred to cases are not apposite, because in each one of them the parties to the transfer or sale intended that title to the "certain object" of the sale would go to the purchaser. It subsequently developed that there was lack of title in the vendor or a defect in his title, which he then had cured, and the Court, in every instance, held that the vendor could not assert these newly acquired rights against his purchaser, but that, under the law, the newly acquired rights or perfected title inured to the benefit of the purchaser.

Counsel for the plaintiffs have cited, as being in point, the case of Bodcaw Lumber Co. v. Clifton Heirs, 169 La. 759, 126 So. 52, 53. In that case, Mrs. Simma Clifton, the owner of both the land and the timber, sold the pine timber to the Bodcaw Lumber Company on May 1, 1906, granting the Company ten years within which to remove the timber. About four months later, Mrs. Simma Clifton sold the land, without mentioning the timber, to her mother, Mrs. Minnie Clifton, from whom the defendants claimed the timber by inheritance. On September 18, 1907, Mrs. Minnie Clifton sold the land, less the timber thereon, "and all other rights held therein by * * * vendor," to N. M. Hyde. The question presented was the proper construction and effect to be given to the deed with reference to the reversionary interest in the timber. The Court said:

"Therefore, if Mrs. Clifton had retained the ownership of the land, the defendants unquestionably would be entitled to the timber, under the reversionary right of their mother to it. However, as Mrs. Clifton

sold the land to Hyde, without the pine timber, the title to which was vested in another, without any clause indicating her intention to retain the reversionary right to the timber, which had been sold by her vendor, that right passed to Hyde with the land. Not only did the reversionary right to the timber pass to Hyde for that reason, but also because, in making the sale of the land, she did so with full subrogation to all her rights of warranty and all other rights held in the land by her. The expression, 'all other rights held in the land by her,' or, as expressed in the deed, 'all other rights held therein by said vendor,' was sufficient to convey, and did convey, the reversionary right, which she had to the timber, which was an incident of her ownership of the land. Brown v. Minden Lumber Company, 148 La. 175, 86 So. 727.

"Hence, as Mrs. Clifton parted with her reversionary right to the timber before the period for removing it expired, the timber did not revert to her, and therefore defendants, as her heirs, have no claim to it whatever."

We do not think that the above case is controlling here, because in the instant case the fee title owner, McFarlain, retained his ownership of the land, and we have found by interpreting and construing the Triche deed that he did not part with his reversionary interest to the mineral rights of Fontenot. The case would be in point, if McFarlain had sold the land itself with all of his rights, title, interest and ownership thereof to the purchasers in the Triche deed.

■ We conclude that the plaintiffs' claim as owners of the mineral rights under the law of accretion, through the Triche deed, is without merit.

In reply to the defendants' plea of prescription of ten years liberandi causa against the mineral servitude granted in the Triche deed by McFarlain (other than the claimed servitude under the alleged conveyance of the reversionary interest by McFarlain), the plaintiffs contend that the mineral leases existing on the ten acres of land at the time the Triche deed was executed on July 20, 1926, constituted an obstacle which suspended the accrual of the liberative prescription as long as these leases remained in effect i. e., until 1931, under Article 792 of the R.C.C. The defendants controverted this proposition, urging in avoidance of its effect that the purchaser of mineral rights of land already covered by recorded mineral leases takes the mineral rights "subject to" the rights of the mineral lessees, by virtue of the law of registry, in the same sense that the purchaser of mineral rights takes them under the law when the mineral deed expressly states that the grant of the mineral rights was "subject to" the mineral rights of the lessees under the pre-existing and recorded mineral leases, citing Coyle v. North Central Texas Oil Co., 187 La. 238, 174 So. 274; Superior Oil Producing Company v. Leckelt, 189 La. 972, 181 So. 462; Myers v. Cooke et al., 175 La. 30, 142 So. 790; Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1, and Holladay v. Darby, 177 La. 297, 148 So. 55. They concluded from the above that the pre-existing leases do not, therefore, present an obstacle which suspends prescription under Article 792, R. C.C.

Defendants also argue that, under the facts of this case, prescription was not suspended because the plaintiffs acquiesced in the pre-existing leases and made their mineral servitude subject thereto by approving the leases and accepting the rentals from the lessees or their assignees of the pre-existing recorded leases. Therefore, plaintiffs definitely brought themselves under the cases of Coyle v. North Central Texas Oil Co. and Superior Oil Producing Company v. Leckelt, supra.

In answer to the defendants' above contentions, the plaintiffs point out that they, nor their authors in title, purchased their mineral servitude expressly subject to the prior recorded mineral leases as was done in the Coyle and Leckelt cases, and that plaintiffs were ignorant of the existence of these leases at the time they acquired their rights and for sometime thereafter. They, therefore, say that this difference of fact from the Coyle and Leckelt cases makes them inapplicable. They also state that only certain obiter dicta statements in the Coyle case are contrary to their position and that the decree in the Coyle case is in their favor.

Plaintiffs further assert, in the alternative, that the record shows that some of the plaintiffs, representing 5/10 of one-half of all of the mineral rights, acquiesced in the mineral leases by accepting rentals therefrom more than a year after the execution of the Triche deed, but that the other plaintiffs or co-owners of 5/10 of one-

half of all of the mineral rights never received any of the rentals and did not know of the existence of the prior leases at the time they purchased their rights. They also state that, under the facts of the case, it appears that the acquiescence of some of the plaintiffs in the pre-existing leases occurred, at the earliest, on October 17, 1927, when they accepted the rentals, and as this suit was filed on October 11, 1937, the ten year prescriptive period had not elapsed.

Plaintiffs further contend that the drilling operations by Glassell & Glassell, assignees under the McFarlain lease to W. B. Conover on May 24, 1935, commencing on April 30, 1937 and resulting in the production of oil on June 21, 1937, interrupted prescription before the ten year period lapsed.

Article 792 of the Revised Civil Code, reads:

"If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of nonusage does not run against him as long as this obstacle remains."

Article 2015 of the Revised Civil Code, reads:

"Not only servitudes, but leases and all other rights, which the owner had imposed on his land before the alienation of the soil, form real obligations which accompany it in the hands of the person who acquires it, although he have made no stipulation on the subject, or they be not mentioned in the act of transfer. The pur-chaser may, if the circumstances permit it, have relief against the seller for concealment of such charges; but the law establishes the rule that no one can transfer a greater right than he himself has, except where the neglect of some formality required by law has subjected the owner of the real incumbrance to a loss of his right, in favor of a creditor or bona fide purchaser."

██ There is no doubt under the law of registry, that the purchaser or grantee of mineral rights or a servitude takes his ownership thereof subject to pre-existing recorded leases covering the same mineral rights. The law gives him constructive notice and imputes to him knowledge of the existence of the lessees' rights by the recordation. At the time the mineral servitude owners purchased their rights, they and the fee simple owner of the land who sold them to him were powerless to put into the mineral deed any clause which would take away the rights of the mineral lessees without their consent. In other words, the law read into the Triche deed the legal effect that the mineral servitude owners' rights were subject to the mineral lessees' rights. But the law vested in the servitude owners' favor the benefits flowing from the mineral lessees' obligations to pay rentals and royalties.

It is said that constructive notice or imputed knowledge, under the law of registry, is not equivalent to actual knowledge of prior encumbrances, because Article 2015 of the Revised Civil Code expressly states that the purchaser may have relief against the seller for the concealment of such

charges. However, even in that situation, when the purchaser learns of the imposition, he is confronted with the duty of repudiating the transaction against the seller for alleged fraud or concealment and claiming such damages as it might have caused him, or expressly or tacitly approving the transaction.

Conceding that some of the plaintiffs, who are the original grantees in the Triche deed, did not have actual knowledge of the prior recorded leases at the time they purchased their mineral rights, the record clearly shows that they, shortly thereafter, became apprised thereof and asserted their rights to the benefits thereunder.

On April 4, 1927, one of the original purchasers or grantees of the Triche deed wrote the following letter to the assignees of the prior recorded mineral leases:

"Jennings, La.,
"April 4th, 1927.
"Attention Mr. J. M. Vetter
"Rio Bravo Oil Company,

"Houston, Texas.
"Dear Sirs:

"As per your suggestion in yours of the 1st., I am enclosing you herewith certified copy of sale of mineral rights on certain ten acres in Evangeline Oil Fields from Robert McFarlain to myself et als., which should entitle us to rentals on the within described property.

"Thanking you for your attention, I am,
"Yours truly,
"(Signed) W. D. deGravelle."

This letter was followed by the mineral right owners (some of the plaintiffs), signing an instrument dated September 30, 1927, in which they claimed the benefits of the prior recorded leases, i. e., their pro rata share of the rentals and royalties, and this document was forwarded to the Rio Bravo Oil Company by W. D. deGravelle with another letter of October 4, 1927, which reads as follows:

"Jennings, Louisiana,
"Oct. 4th, 1927.
"Rio Bravo Oil Company

"Houston, Texas.
"Dear Sirs:

"Enclosed herewith affidavit signed by parties who are entitled to interest and their percentage in ten acres of McFarlane (McFarlain) tract.

"Did not consider it necessary for McFarlane (McFarlain) to sign this instrument as I have previously furnished you with certified copy of deed of sale.

"Yours truly,
"(Signed) W. D. deGravelle."

Apparently, the Rio Bravo Oil Company's representatives wanted definite documentary proof of the mineral owners' rights to demand the rentals, as appears from the letter dated October 17, 1927, which reads:

"Jennings, La.,
"October 17th, 1927.
"Rio Bravo Oil Co.,

"Houston, Texas.
"Dear Sirs:

"Your wire date and my reply; I will send you a certified copy of deed of sale of myself to Russell Campbell, Frank Jaenke to W. M. Campbell and Sheriff's

sale of C. W. Triche's interest to J. C. Hazel, as soon as I can have them prepared.

"Each one of these sales conveys one-half of the interest held by each in original sale, except in Triche's interest sold at Sheriff's sale to Hazel which is the ⅙ interest Triche acquired in original deed.

"Each one of these sales conveys one-half of the interest held by each in original sale, except in Triche's interest sold at Sheriff's sale to Hazel which is the ⅙ interest Triche acquired in original deed.

"The Jennings Bank & Trust Co., of Jennings, La. acting as depository.
"Yours truly,
"(Signed) W. D. DeGravelle."

There is no doubt that all of the original purchasers or grantees in the Triche deed of July 20, 1926, received their pro rata of the rentals from the prior recorded leases, as a result of the foregoing demands. It is, therefore, clear that the original grantees under the Triche deed, with actual knowledge, acquiesced in and approved the leases on April 4, 1927, and took their mineral rights or servitude subject to the prior recorded leases.

 It is argued that some of the plaintiffs, who are grantees or assignees of the original purchasers, or grantees under the Triche deed, did not have actual knowledge of the prior recorded leases and never knew their authors in title demanded and accepted rentals and that as they never received any of the rentals therefrom they were not bound thereby. Conceding this to be the true situation, their position is still untenable because, as assignees, or grantees, these plaintiffs obtained no greater rights than their assignors or grantors had under the Triche deed. As their assignors or grantors had already acquiesced in the leases, as we have shown above, before these assignments or grants were made, the assignees or grantees could not gain any greater or superior rights.

 To maintain plaintiffs' contention that the later mineral purchasers from the original mineral owners under the Triche deed are not bound by the acquiescence of their predecessors in title would be, in effect, holding that the later transfers by the mineral right owners under the Triche deed to third parties interrupted prescription. Briefly, that the running of the prescriptive period can be prevented merely by the owner of the mineral rights transferring the same to someone else. Certainly, this is not sound, because the purchasers and the grantees from the original owners of the servitude under the Triche deed had legal knowledge of the recordation of the leases and the Triche deed and it was their duty, if they thought they were acquiring a servitude free of the leases, to determine if the rentals had been paid under the leases to their authors in title. English v. Blackman, 189 La. 255, 179 So. 306; Baird v. Atlas Oil Co., 146 La. 1091, 84 So. 366; and Ohio Oil Company v. State of Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729. If they had performed this legal duty, they would have discovered that their authors in title had acquiesced in the prior recorded mineral leases on April 4, 1927, and therefore, that prescription was running against their

mineral rights in the usual way. If this information had been concealed from them by their authors in title, then it was their duty upon discovering the facts to repudiate the sale or grant on the grounds of imposition and fraud, or to expressly or impliedly confirm it. They could not sit idly by and many years later complain that the leases were an obstacle because they did not have actual knowledge of their existence and the acquiescence therein by their authors in title at the time they purchased their rights.

In the case of Superior Oil Producing Company v. Leckelt, 189 La. 972, 181 So. 462, this Court held that the drilling operations commenced by the assignee of a prior recorded lease interrupted prescription in favor and for the benefit of the subsequent mineral purchasers or grantees, who had actual knowledge of the lease.

In Coyle v. North Central Texas Oil Co., 187 La. 238, 174 So. 274, this Court held that the purchaser of mineral rights, with actual knowledge of a prior mineral lease, was not a purchaser of a suspended servitude, and that the prior recorded lease was not an obstacle which suspended prescription in favor of the subsequent mineral owner and ten years having lapsed without any operations by the leaseholder or the mineral owners, that the prescription of ten years for nonuse was effective.

In the instant case, nothing was done by the lessees or the assignees of the prior recorded mineral leases and they expired in 1931. None of the plaintiffs, as mineral owners, ever commenced drilling a well on the property at any time and

the first drilling operations were commenced on April 30, 1937, by Glassell & Glassell, under the mineral lease that McFarlain granted W. B. Conover on May 24, 1935. Therefore, as more than ten years passed from April 4, 1927, to April 30, 1937, without any use being made of the mineral servitude, it lapsed for nonuse.

Before this case was argued and submitted, a joint motion was filed in behalf of all of the plaintiffs and appellants and the following defendants: Mrs. Cora M. Conover, individually and as executrix of the Estate of W. B. Conover, William V. Conover, Richard V. Conover, George Gilmer Grattan, III, as tutor to the minors, Elizabeth Conover Grattan and George Gilmer Grattan IV, A. C. Glassell, Jr., and Glassell and Glassell, alleging that a compromise agreement having been entered into between the parties (which document was annexed to and made part of the motion), the suit and appeal should be dismissed as to these defendants, with full reservation of all of plaintiffs' rights as against the other defendants. Therefore, the judgment in this case will have no effect whatsoever upon the above named parties insofar as their asserted rights have been compromised.

For the reasons assigned, the judgment in favor of the defendants who are now before the Court as appellees is affirmed at the cost of the plaintiffs, appellants.

O'NIELL, C. J., concurs in the result, but is of the opinion that it matters not whether the deed from McFarlain to Triche, dated July 20, 1926, did or did not

convey the so-called reversionary interest, because, if that interest was so conveyed it was subject to the prescription of ten years; and it matters not whether the ten years should be reckoned from that date or from September 26, 1922; because, in either event, the ten years expired before this suit was filed.