197 So.2d 672 (1967)
WHITEHALL OIL COMPANY, Inc. et al., Plaintiffs-Appellees,
v.
Mrs. Alice Boagni HEARD et al., Defendants-Appellants-Appellee.
No. 1942.
Court of Appeal of Louisiana, Third Circuit.
March 21, 1967.
Rehearing Denied April 12, 1967.
Writ Refused June 20, 1967.
*673 Voorhies, Labbé, Fontenot, Leonard & McGlasson, by Bennett J. Voorhies, Lafayette, Andrus & Pavy, by Alex L. Andrus, Jr., Opelousas, Kantrow, Spaht, Weaver & Walter, by Carlos G. Spaht, Baton Rouge, for defendants-appellants-appellees.
Liskow & Lewis, by William M. Hall, Jr., Lafayette, for plaintiff-appellee.
Pavy & Boudreaux, by A. V. Pavy, Morgan J. Goudeau, III, Opelousas, for plaintiffs-appellees-appellants.
Lewis & Lewis, by Seth Lewis, Jr., Boagni & Boagni, by Charles F. Boagni, Jr., and Charles F. Boagni, III, Opelousas, for defendants-appellees.
En Banc.
TATE, Judge.
This is a concursus proceeding. LSA-CCP Art. 4651. The owners of mineral leases deposit into the registry of the court a disputed share of mineral royalty payable under the leases of the subject tract (Lot "F").[1] This royalty resulted from mineral production in 1960 and following.
On appeal, the remaining issue is whether this royalty belongs to the appellee owner of the land (Mrs. Alice Boagni Heard), who acquired it in 1942, or instead to the opposing appellant parties (the Vincent-Richard group),[2] who claim by virtue of a mineral royalty interest reserved at the time Mrs. Heard acquired Lot "F" in 1942. The Vincent-Richard group appeals from trial court judgment in favor of the landowner and holding that their mineral royalty interest had prescribed through ten years' non-use.[3]
The appellant Vincent-Richard group contends that 1950 and 1951 production from adjacent tracts (Lots "B" and "G") was an interrupting use which prevented their 1942 mineral royalty interest from prescribing. In so arguing, the Vincent-Richard group thus contends that their mineral royalty reservations affecting Lot "F" were single royalty rights affecting the entire parent tract including Lots "F", "B", and "G"rather than each being a separate royalty right affecting Lot "F" only, as the trial court held.
*674 Facts.
The Vincent-Richard group essentially contends that each heir of the late Edward M. Boagni, Sr., holds a single undivided mineral royalty reservation affecting all of the properties held by his estate prior to its partition in 1942.
Prior to the partition, the estate held many tracts of land in St. Landry, Evangeline, and Lafayette Parishes. Included in this estate property was the Belmont-Midway Plantations in St. Landry Parish, including over 3,000 acres. As a result of the partition, this large, contiguous plantation was divided into eight tracts, including (pertinently to this litigation) Lots "B", "E", "F", and "G".
The heirs divided all these estate properties through three separate conventional acts of partition. The first divided the estate properties into two separate groupings of property, with slightly differing sets of testamentary heirs and children going into possession in indivision of these two separate groupings of estate properties.[4] In this first partition, there was no attempt to reserve any mineral royalties in either group of the properties.
Of the same date, but recorded a day later, the respective sets of overlapping heirs then partitioned among themselves the properties received. In each of these latter two instruments, the heirs divided the lands so that each received a number of tracts in fee ownership, subject to mineral royalty rights in favor of the coheirs totaling 40% of any production to be realized.
The appellee Mrs. Heard acquired the ownership of Lot "F" in one of the acts of partition.[5] By it, the four co-owning heirs divided among themselves 22 St. Landry Parish tracts and 11 Evangeline Parish properties, scattered throughout the two parishes and mostly non-contiguous. These 33 scattered properties were divided into four parts of approximately equal value. Each of the four heirs received one of these parts (denoted as Lots 1, 2, 3, and 4), subject to mineral royalty reservations in favor of the other heirs.
Among the properties received by Mrs. Heard (Lot 1), was Lot "F" of the Belmont-Midway Plantations, the subject tract of this litigation. The adjacent Lot "G" (1951 production from which is urged as an interruption of prescription) was part of another group (Lot 4) of the former estate properties, which fell to Edward M. Boagni, Jr. (The subject tract of the companion suit, Lot "E", was included in the group of properties, Lot 3, which became the property of the late Vincent Boagni, Sr.)
The appellee Mrs. Heard, as owner of Lot "F", contends that she acquired title subject to royalty rights of the other heirs which affected this lot alone. The appellant Vincent-Richard group contends that the royalty reservations in favor of each of Mrs. Heard's coheirs was a single undivided royalty right affecting the entire contiguous area of the old Belmont-Midway Plantations.
The Louisiana Mineral Royalty Right and Its Creation.
In deciding this principal contention, it may be well first to discuss the nature of the Louisiana mineral royalty right, since *675 some of the arguments made are inconsistent with this recognized legal concept.
Louisiana adheres to the non-ownership theory of mineral interests, whereby those owning mineral interests do not own the minerals beneath the surface but only a right to produce them or to share in mineral production. Yiannopoulos, Civil Law of Property, Volume, 1, Section 99 (1966); Daggett, Louisiana Mineral Rights, Section 1 (Rev. ed., 1949); Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (1922) and succeeding jurisprudence. A mineral royalty is a right to share in mineral production or the proceeds therefrom. Yiannopoulos, Section 102; Daggett, Section 4, Sections 60-68 (chapter vi).
The jurisprudence has defined the mineral royalty interest as a species of real right imposed upon the land and prescribed by ten years' non-use, which entitles the royalty owner to participate in production if and when received. Correlatively, insofar as the land affected, it is a real obligation in favor of the royalty owner, which is attached to the land and passes with it into whatever hands it may come, and which prescribes unless mineral production occurs within ten years.
See: Yiannopoulos, Id.; Daggett, Id.; Succession of Simms, La., 195 So.2d 114 (decided November 7, 1966); Crown Central Petroleum Corp. v. Barousse, 238 La. 1013, 117 So.2d 575; Union Oil & Gas Corp. v. Broussard, 237 La. 660, 112 So.2d 96; LeBlanc v. Haynesville Mercantile Co., 230 La. 299, 88 So.2d 377; Vincent v. Bullock, 192 La. 1, 187 So. 35.
As these authorities show, the royalty right is a charge on the right to remove minerals from the land, which "mineral right" (if held by other than the land's owner) is classified as a servitude, yet another species of real right attaching to the land affected. Therefore, a royalty right is subject to the same limitations in creation and is extinguished by the same prescriptive causes as would extinguish a mineral right to which it was an appendage. Union Oil & Gas Corp. v. Broussard, cited above, at 112 So.2d 113-114; Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73; see also Frey v. Miller, La.App. 3 Cir., 165 So.2d 43, 48-49, certiorari denied.
Thus, for instance, a landowner cannot create a single servitude or mineral royalty right on two or more non-contiguous tracts; and if this is attempted by a single instrument, there are nevertheless as many servitudes or royalty interests as there are non-contiguous tracts of land. Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73; Calhoun v. Ardis, 174 La. 420, 141 So. 15; Lee v. Giauque, 154 La. 491, 97 So. 669. On the other hand, there is no limitation in the area or configuration of a contiguous mineral interest. Gulf Oil Corp. v. Clement, 239 La. 144, 118 So.2d 361; Lenard v. Shell Oil Co., 211 La. 265, 29 So.2d 844 (80,000 acres).[6]
In sum, owners of land may create a single mineral servitude or royalty so long as they own the lands in question and so long as the tracts in question are contiguous and form a single, continuous body of land. Determination of whether a landowner reserving or granting mineral servitude or mineral royalty rights intends to create a single servitude or royalty interest or instead multiple interests is, therefore, dependent upon construction of particular conveyances. For example, it has been held that two separate deeds by the *676 same landowner conveying mineral interests in two contiguous tracts of land create separate mineral servitudes although acquired by the same mineral owner. Cox v. Acme Land & Investment Co., 192 La. 688, 188 So. 742. Thus, whether the landowner intends to reserve a single or multiple interests by a particular reservation must similarly depend upon principles of contractual construction.[7]
We see no reason why these same principles do not apply when, as in the present case, co-owners partition a contiguous tract, with each simultaneously reserving a mineral royalty interest or interests. If the parties so intend, each might receive a single royalty right attaching to the entire former co-owned lands insofar as still contiguous and not (after the partition) separated (see footnote 6) by his own ownership. Likewise, whether either multiple royalty interests are created in favor of each co-owner, or instead (insofar as legally possible) a single royalty interest, must ultimately be decided in accordance with the intent of the parties as reflected by the partition agreement.
These Principles Applied to the Present Partition.
In the 1942 partition agreement the appellee Mrs. Heard acquired Lot "F" subject to a mineral royalty right in favor of each of her coheirs. Her appellant coheirs contend that their royalty rights were not prescribed by ten years' non-use because prescription had been interrupted by 1951 production on the adjacent Lot "G" (which Edward Boagni, Jr., received in the partition). In making this argument, the coheirs contend that the royalty right in favor of each of them attached as a single royalty reservation to the entire 3,000 contiguous acres of the former Belmont-Midway Plantations, rather than as a separate royalty right attaching independently to each of the smaller tracts (pertinently, Lots "B", "E", "F", and "G") into which the plantation was divided by the partition.
As summarized above, this determinative question is to be decided by the intention of the parties as reflected by the partition agreement: Did they intend each tract transferred to be subject to separate mineral royalty reservations which affected that tract alone? Or did they instead intend for each coheir to have a single undivided mineral interest affecting the entire mass of the property partitioned by the agreements?
After examining the partition agreement by which Mrs. Heard acquired Lot "F" subject to mineral royalty rights in favor of her coheirs, we have concluded that the instrument should be construed as providing for a separate mineral royalty reservation in favor of each coheir affecting each "lot"[8] partitioned. We do not interpret the agreement as intending (insofar as legally possible) to provide for a single royalty right in favor of each coheir affecting the entire mass of the property partitioned.
To aid in our explanation of this conclusion, we have set forth in full as the Appendix to this opinion the pertinent portions of the conveying and mineral royalty clauses of the partition agreement (Exhibit BEG-3) by which the appellee Mrs. Heard received Lot "F" subject to mineral royalty reservations in favor of her coheirs.
*677 The agreement provides that to each heir was transferred his "lot" (i. e., group of properties) "subject to" a reservation or grant totaling 40% of the mineral royalties in favor of the other Edward M. Boagni heirs.
Insofar as the instrument states that the parties reserved or granted mineral royalties "in and to the lots" as part of the agreement of partition, the inference could reasonably be drawn that the parties intended to create a single undivided royalty affecting all properties partitioned by the instrument. This inference is also supported by the provision that "The royalty rights so reserved by the said parties in and to the lots allotted to the others; including the rights of Richard O. Eckart, shall be and remain an obligation attached to said lands binding on any owner or owners thereof or of the mineral rights therein or lessees operating thereon * *."
These provisions do not necessarily require this inference, however. They are not inconsistent with the intention that each heir intended to acquire his lot subject to separate royalty rights which would expire as to a particular tract if no production from that tract resulted in ten years.
Further, this latter intentionof each heir's having separate royalty reservations rather than a single undivided oneseems somewhat more consistent with the agreement's statement that: "* * * [it is] the intention hereof that the lot allotted to each of the said parties shall be subject to oil, gas and mineral royalty rights vested in the other parties and in the said Richard O. Eckart to the extent of a total of forty per centum (40%) thereof, leaving vested in the owner of each of said lots sixty per centum (60%) of all of such royalties to accrue under any lease or other contract affecting said land * * *."
If this latter is the case, for instance, Mrs. Heard received title to Lot "F" subject to separate mineral royalty rights of each of her coheirs which only affected property received by her as part of her "lot" (see footnote 8) in that partition (Exhibit BEG-3). If this be the intention of the parties, the other heirs each owned entirely different royalty rights affecting Lot "G" (received by Edward Boagni as part of a different "lot", affected by that lot's royalty reservations). Likewise, they each owned yet a different royalty right affecting Lot "B"[9] received by Mrs. Heard in an entirely different partition agreement (Exhibit BEG-2) containing mineral royalty reservations affecting only the properties thereby partitioned, entirely distinct from any royalty rights created by the present partition agreement (BEG-3).
On the other hand, should we interpret the royalty agreement as affording each heir a single royalty right attaching to all contiguous areas of the estate property partitioned, despite its division into separate lots, then Mrs. Heard received title to Lot "F" subject to mineral royalty reservations which could be preserved by production from Lots "E" or "G" as well as from her own land. This latter interpretation is thus less favorable than the former to the owners who received properties by the partition, since it provides for burdening their land with royalty rights of longer duration and easier perpetuation.
*678 Ultimately, we conclude that, where the instrument could as reasonably be interpreted either way, the proper interpretation is that which least restricts the ownership of the land conveyed, as in the case of mineral servitudes. Gailey v. McFarlain, 194 La. 150, 193 So. 570, 573-574 (syllabus 2); cf. also, text above immediately prior to footnote 6. In so concluding, we rely on the legislative mandate that "Servitudes which tend to affect the free use of property, in case of doubt as to their extent or the manner of using them, are always interpreted in favor of the owner of the property to be affected." LSA-Civil Code Art. 753. See McGuffy v. Weil, 240 La. 758, 125 So.2d 154.
We therefore affirm the conclusion of the trial court that the appellee Mrs. Heard owns Lot "F" free of the 1942 royalty reservations subject to which she had acquired it in 1942.
Decree.
For the reasons assigned, we affirm the judgment of the trial court that the defendant-appellee, Mrs. Alice Boagni Heard, is entitled to all remaining royalty funds in dispute on deposit in the registry of the court. The defendants-appellants are taxed with the costs of this appeal.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.

APPENDIX
Excerpted in full from the partition agreement are the conveying and the mineral royalty clauses discussed (Italics ours):
"* * * That they drew for said lots by chance in a manner entirely satisfactory to themselves, whereupon Lot 1 fell to and became the property of MRS. ALICE BOAGNI ROZAS, Lot 2 fell to and became the property of VINCENT BOAGNI, Lot 3 fell to and became the property of MRS. SUSAN BOAGNI GARDNER, and Lot 4 fell to and became the Property of EDWARD M. BOAGNI, JR., Appearers further declared that they are perfectly satisfied with the partition thus made and with the lots drawn by them respectively, as hereinabove set forth, that for the purpose of this partition they have agreed, and do hereby agree, to consider said lots to be of equal value, and to forego and waive any and all return in money to equalize any supposed inequality in the valuation of the lots.
And in confirmation of the premises and the better to carry out this partition, and to vest each other with absolute title to the properties received by each as each's share of the properties to be partitioned, each does hereby declare that in consideration of the properties received by him or her as aforesaid, he or she does hereby sell, assign, convey, transfer and deliver to each of the others, all the rights, share, portion, or interest, which he or she had or has in and to the lots drawn by each of the others.
To have and to hold in full ownership forever unto MRS. ALICE BOAGNI ROZAS, the properties above described as forming Lot 1, unto VINCENT BOAGNI, the properties above described as forming Lot 2, unto MRS. SUSAN BOAGNI GARDNER, the properties above described as forming Lot 3, and unto EDWARD M. BOAGNI, JR., the properties above described as forming Lot 4, subject to the following disposition of the mineral rights, which inhere in the properties received by each, to wit:
In order that all of the parties hereto may participate to the extent hereafter set forth in the oil, gas and other mineral royalties which might accrue out of the production of any of such minerals from said lands, each of the parties hereto, as part of this agreement of partition, reserves in and to the lots hereby allotted to the others the oil, gas and mineral royalties equal to eleven per centum (11%) of one-eighth (1/8th) of all the oil, gas and other minerals produced from said lands either by the owner of the lands or of the mineral rights therein or by any lessee or others operating under any contract whatsoever. And in consideration of the transfer of certain rights to the parties hereto by Richard O. Eckart under another partition of even date herewith, all of the Appearers herein transfer and assign unto the said Richard O. Eckart, his transferees and assigns, oil, gas and mineral royalty rights in and to the lots respectively allotted to them equal to seven per centum (7%) of one-eighth (1/8th) of all the oil, gas and other minerals produced from said lands; it being the intention hereof that the lot allotted to each of the said parties shall be subject to oil, gas and mineral royalty rights vested in the other parties and in the said Richard O. Eckart to the extent of a total of forty per centum (40%) thereof, leaving vested in the owner of each of said lots sixty percentum (60%) of all *679 of such royalties to accrue under any lease or other contract affecting said land. The royalty rights so reserved by the said parties in and to the lots allotted to the others; in cluding the rights of Richard O. Eckart, shall be and remain an obligation attached to said lands binding on any owner or owners thereof or of the mineral rights therein or lessees operating thereon, such royalties to be delivered or paid free of expense out of any oil, gas or other minerals produced from said property by any such owner or lessee, subject, however, to such proportionate deductions as may apply to the lessor's royalty under any lease affecting the land, but the owner of the fee title to each of the said lots, as herein * * *."
NOTES
[1] The principal issue of a companion suit is the same as that of the present suit involving Lot "F"; the companion suit concerns mineral royalty attributable to Lot "E". Whitehall Oil Co., Inc. v. Boagni, 197 So.2d 679, decided this date.

Two other suits involving the same parties were also argued before us at the same hearing. They concern royalty attributable from Lot "G", as to which the 1942 royalty reservation was concededly kept alive by the 1951 production. Whitehall Oil Co., Inc. v. Eckart, 197 So.2d 664; Gardner v. Boagni, 197 So.2d 671. The issues in these latter two suits (concerning the ownership of an overriding royalty interest) are entirely different from the present.
[2] These are the other legal and testamentary heirs of the late Edward M. Boagni, Sr. (or their successors): Vincent Boagni, Jr., Richard O. Eckart, Susan Boagni Gardner, and Edward M. Boagni, Jr.
[3] A mineral royalty interest affecting a surface tract expires unless there is use or exercise of it within ten years by actual mineral production from a tract subject to the royalty interest. LSA-Civil Code Articles 790, 3529, 3546; Union Sulphur Co. v. Andrau, 217 La. 662, 47 So.2d 38; St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So.2d 169; Vincent v. Bullock, 192 La. 1, 187 So. 35.
[4] This partition is in evidence as Exhibit BEG-1, an act of partition between the Trustees of the Estate of E. M. Boagni and the heirs, dated and recorded November 23, 1942, as Act No. 213402, records of St. Landry Parish.
[5] This is Exhibit BEG-3, dated November 23, 1942, and recorded as Act No. 213418, records of St. Landry Parish. By another act of partition (Exhibit BEG-2) of same date, but recorded as Act No. 213417, records of St. Landry Parish, Mrs. Heard acquired Lot "B", on which there was mineral production in 1950, also relied upon by appellants as an interruption of production. In view of our disposition below of the principal issue, it is unnecessary for us to discuss the relationship of these two partition agreements, as to which there is much discussion in the briefs of the parties.
[6] Under the conclusion we arrive at below, we do not face the appellant's argument that each of the five heirs had a single royalty right affecting all contiguous tracts formerly owned by the estate, even though by the partition such royalty right might attach to land received by that heir. See, however, code provisions that a servitude is extinguished by confusion when the estate owing it and the estate to which it is due become united in the same hand. LSA-CC Arts. 793, 805; Daggett, Section 13; Arent v. Hunter, 171 La. 1059, 133 So. 157.
[7] For a discussion of these matters, see Nabors, The Louisiana Mineral Servitude and Royalty Doctrines: A Report to the Mineral and Royalty Committee of the Louisiana Law Institute, 25 Tul.L.Rev. 155, 173-75 (1951).
[8] As used in the conveying (habendum) clause of the partition agreement, the term "lot" referred to the entire group of properties received by a particular heir as his share of the properties partitioned. Of course, for the reasons earlier expressed such separate mineral royalty reservation in favor of each heir against each "lot" actually became multiple royalty rights separately attaching to each non-contiguous tract.
[9] Lot "B" was received by Mrs. Heard in an entirely different partition, BEG2, and had been divided along with the north half of the Belmont-Midway Plantations from the present southern lots by an earlier partition which vested in differing ownerships the title to the northern and southern portions repectively. See footnotes 4 and 5. We do not reach the substantial question that under any circumstance the royalty reservations on Lot "B" and Lot "F", although both owned by Mrs. Heard, are entirely separate as created by separate deeds from different though contiguous tracts. Cox v. Acme Land & Investment Co., 192 La. 688, 188 So. 742. The royalty right agreement in this other partition agreement (BEG2) can similarly to the present be interpreted as providing for multiple rather than a single royalty interest in favor of each heir.