528 So.2d 786 (1988)
Coy RODGERS, et al., Plaintiffs-Appellees,
v.
CNG PRODUCING CO., et al., Defendants-Appellants.
No. 87-394.
Court of Appeal of Louisiana, Third Circuit.
July 7, 1988.
*787 Joseph Wilson, Jena, for defendants-appellants.
Marc Dupuy, Jr., Edwin L. Lafargue, Marksville, and J.W. Seibert, Vidalia, for plaintiffs-appellees.
Before LABORDE, YELVERTON and KNOLL, JJ.
KNOLL, Judge.
CNG Producing Company (hereafter CNG) and Pennco Energy, Inc. (hereafter Pennco) appeal the judgment of the trial court which declared their predecessor's deed of mineral acquisition a nullity.
Coy Rodgers and his wife, Mary Lou Bennett Rodgers, (hereafter Rodgers) together with their mineral lessee, Big-Joe Oil Company (hereafter Big-Joe), sued James W. Thompson, Jr., John A. Daye, Faye Thompson Daye, Don Lewis Thompson, Mark Kelly Thompson, and Marie Scallon Thompson Broadnax (hereafter Thompson) and their mineral lessee, Sun Belt Energy, Ltd. (hereafter Sun Belt), and its assigns, CNG and Pennco, seeking recognition that they (Rodgers) were the owners of the mineral rights, and entitled to damages on an alleged trespass by CNG in 1985 when CNG, acting pursuant to its rights derived from a purported mineral lease in 1983 from Thompson, drilled a dry hole on Rodgers' property.[1] The facts of the case were stipulated, and the parties agreed to bifurcate the trial, trying the issue of mineral ownership first.
The trial court held that the questioned sale of minerals from Rodgers to Thompson was an indirect reservation by Thompson of a reversionary interest in violation of Article 76 of the Mineral Code, and as such, was a nullity. CNG and Pennco contend on appeal that the trial court erred: (1) in failing to apply Article 77 of the Louisiana Mineral Code; and (2) in improperly admitting into evidence an unrecorded buy-sale agreement executed between Rodgers and Thompson. We affirm.

FACTS
The learned trial judge set forth the stipulated facts in chronological order which we incorporate herein:
"(1) October 22, 1968Ethel M. Kelly, Et Al sold to James W. Thompson, Jr., Et Al (the Thompsons) a tract of land containing 1580 acres, more or less, located in Concordia Parish. The vendors reserved all mineral rights.
(2) February 5, 1975The Thompsons executed a `Buy-Sale Agreement' with Coy Rodgers, Et Ux. In this agreement the Thompsons agreed to sell and the Rodgers agreed to buy, the 1580 acre tract for a consideration of $376,000.00. Ten Thousand ($10,000.00) was paid by Rodgers on this date and he agreed to pay the balance in ten equal annual installments. The agreement was subject to `reservation of a mineral servitude contained in the deed of acquisition of *788 vendor' and contained the following provisions:
`4. As further consideration and as an integral part of this sale, vendee grants to vendor the right to purchase for the sum of one thousand and no/100 ($1000.00), all oil, gas and other mineral rights in, on and under the above described property at the time of the execution of this sale.' (Emphasis Supplied [by the trial court].)
(3) April 4, 1975The Thompsons executed a `Sale and Mortgage' to Rodgers, conveying to him the 1580 acre tract with warranty of title and subject to prior reservation of the mineral servitude contained in the Thompsons' deed of acquisition. The consideration was $376,000.00, of which vendors acknowledge $41,000.00 was paid in cash, and Rodgers executed a promissory note in the amount of $355,000.00 payable in ten equal annual installments secured by the usual vendor lien and mortgage. Rodgers actually paid the Thompsons $30,000.00 cash, which added to the $10,000.00 paid on February 5, totalled $40,000.00 even though the Thompsons gave him credit for $41,000.00 in the credit deed.
(4) April 4, 1975On the same day as execution for the aforesaid credit deed, but immediately thereafter, Rodgers executed a `Cash Deed' in favor of the Thompsons conveying to them `all of the oil, gas and other minerals' underlying the 1580 acre tract of land. The sale was made without warranty of title, but with full subrogation to actions of warranty against all prior vendors.
The consideration recited in this deed was $1000.00 cash, but the Thompsons made no separate payment to Rodgers.
(5) October 22, 1978The mineral servitudes reserved by Ethel M. Kelly, Et Al in the Thompsons' deed of acquisition prescribed by reason of liberative prescription of ten years nonusage of the servitudes.
The parties stipulated, and the testimony at trial of Malcolm Barlow, Registered Land Surveyor, confirms, that the 1580 acre tract of land sold by Mrs. Kelly to the Thompsons actually consisted of five non-contiguous tracts. Accordingly, five separate mineral servitudes were created on October 22, 1968. The record further indicates that there was no drilling, utilization [sic] or any other activities which would constitute user [sic] of the servitudes on any of the five non-contiguous tracts. Liberative prescription was not interrupted and, accordingly, all five servitudes prescribed on October 22, 1978.
(6) October 4, 1984The Thompsons executed a mineral lease covering one thousand (1000) acres of the tract to Sun Belt Energy, Ltd. Sun Belt assigned the lease to CNG Producing Company who conveyed an undivided interest to Pennco Energy, Inc. Certain overriding royalty interests were also created in favor of other Defendants named in the lawsuit.
(7) November 20, 1984Rodgers executed a mineral lease in favor of Big-Joe Oil Company covering some of the same property as covered by the Sun Belt lease from the Thompsons.
(8) March 29, 1985CNG Producing Company and Pennco Energy, Inc. spudded a well in the northeast quarter of the southeast quarter, Section 15, Township 1 North, Range 8 East, which was abandoned as a dry hole on April 18, 1985 at a drilled depth of 10,005 feet."

ARTICLES 76 AND 77 OF THE MINERAL CODE
The redactors of the Mineral Code declared in Article 76 that the reversionary interest may not be an article of commerce. In Hicks v. Clark, 225 La. 133, 72 So.2d 322 (1954), the Louisiana Supreme Court held that while the mineral rights of the landowner were outstanding, the landowner could neither sell nor reserve a servitude to take effect upon the prescription of the outstanding one. This holding became a matter of public policy and was codified in Article 76 which provides:
"The expectancy of a landowner in the extinction of an outstanding mineral servitude cannot be conveyed or reserved directly or indirectly." *789 Furthermore, Article 24 of the Mineral Code specifically provides that a mineral servitude may be created only by a landowner who owns the right to explore for and produce minerals when the servitude is created.
In the case sub judice, when Thompson sold the land to Rodgers, Thompson did not own the minerals. Likewise, when Rodgers purported to sell the minerals to Thompson, Rodgers did not own the minerals either. In both instances the mineral rights were subject to an outstanding mineral servitude in favor of the Kellys, who had reserved the mineral rights in their deed to Thompson in 1968.
CNG and Pennco contend that Article 77 of the Mineral Code is applicable to the facts of the present case, and that the after-acquired title doctrine vested a mineral servitude in Thompson.
Article 77 of the Louisiana Mineral Code provides:
"If a party purports to acquire a mineral servitude from a landowner when the right purportedly acquired is outstanding in another and the landowner either subsequently acquires the outstanding right or is the owner of the land at the time it is extinguished, the after-acquired title doctrine operates to vest the right in the party who purported to acquire it to the full extent of his title."
The trial court found Article 77 inapplicable and that the case was governed by Article 76. In its written reasons for judgment, the learned trial court stated:
"It is my opinion, that under the fact situation involved here, that Article 77 of the Mineral Code would have no application. I do not believe that that Article contemplates the type of facts involved here. The contractual relationship between the Thompsons on the one hand, and Rodgers on the other, was essentially one transaction which resulted in the Act of Sale. The mere fact that on April 4, 1975 the sale of the property took place in one instrument and immediately thereafter the new buyer, Rodgers, executed the sale of the mineral rights, which neither he nor the Thompsons owned, does not separate the transactions to such an extent as to put Rodgers in position of the land owner [sic] contemplated by Article 77 of the Mineral Code.
There are a number of facts other than the close proximity in time of the execution of the documents which indicate that they were one transaction. The way the consideration was paid, the fact that a previous Buy-Sale Agreement had been executed in which Rodgers bound himself `as an integral part of the sale' to convey the mineral rights, and the other facts surrounding the transaction indicate that it was all essentially one transaction or contract.
As I understand it, Article 77 of the Mineral Code was adopted to simply recognize the equitable principle of after-acquired title for the purpose of protecting an innocent purchaser from an oversale of mineral rights by a land owner [sic]. In this case, the Thompsons, the prospective purchaser of the mineral rights had full knowledge of all facts from the very beginning of the transaction. Rodgers was bound from the beginning and he sold the minerals he did not own because of his obligation to the Thompsons in the Buy-Sale Agreement. There was no oversale. The devices used here were an attempt by the Thompsons to acquire mineral rights which they did not own and to do exactly what Article 76 of the Mineral Code prohibits. Article 76 of the Mineral Code contains a prohibition against both direct and indirect conveyances or reservations of the expectancy of the extinction of the mineral servitude."
CNG and Pennco first contend that the trial court failed to consider Article 77. We disagree. The written reasons for judgment reflect that the trial court fully considered Article 77 and, after analyzing its provisions, determined that it was inapplicable to the facts presented in the case sub judice. Accordingly, we find that the trial court did examine the facts in light of the provisions of Article 77.
*790 The next contention CNG and Pennco raise is that, notwithstanding the trial court's contrary conclusions, Article 77 is supportive of the validity of the mineral deed at issue. Our considered opinion is otherwise. Thompson's sale of the land in question to Rodgers explicitly states that it is conveyed subject to the reservation of a mineral servitude contained in Thompson's deed of acquisition from the Kellys. Accordingly, when Rodgers and Thompson purportedly transferred the mineral rights in a separate instrument on the same day as the sale of the property, it is evident that they knew that the mineral rights were vested in another, and that they could only be referring to future reversionary rights. Contrary to the assertions of CNG and Pennco that the knowledge of this by the parties was inconsequential, this fact is crucial in our evaluation of the case sub judice.
Article 77 recognizes that the after-acquired title doctrine applies to mineral rights, and that in those cases where it does apply it may cure invalid or fraudulently conveyed rights. However, Article 77 does not legislate the creation of future mineral reservations; it concerns purchases of present servitudes by third parties rendered invalid for reasons of the absence of the mineral rights in the seller who purports to sell them, whether by accidental or intentional oversale. Furthermore, Article 77 is based on the principle of warranty and its applicability is premised on a breach of contract by the seller who has represented to a buyer that he is selling more than he owns, i.e., an oversale. See Dillon v. Morgan, 362 So.2d 1130 (La.App. 2nd Cir.1978). Where the mineral purchaser knows that the seller does not own all of the minerals under the tract of land in question, the warranty is appropriately limited, and any attempt to acquire the overstated minerals by use of the doctrine of after-acquired title is impermissible. See Gailey v. McFarlain, 194 La. 150, 193 So. 570 (1940). In the present case, Thompson knew that Rodgers owned no present mineral interest in the land in question, there existing only a future right to receive the Kellys' interest through nonuse; thus, there was no true oversale of minerals since there existed no present mineral rights which Rodgers could convey. If we were to consider this case as an oversale, we would be allowing the purchaser (Thompson), a principal to both the present transaction and also the original conveyance when the Kellys first reserved the mineral rights, to acquire through Article 77 a future mineral servitude which under the public policy enunciated in Article 76 he was incapable of acquiring outright. We do not find that it was the intent of the redactors for Article 77 to operate in such a manner.
Article 76 clearly states that the conveyance or reservation of a future mineral interest may not be created either directly or indirectly. The trial court held that the two step process by which Thompson ultimately acquired the minerals was an indirect method utilized to defeat Article 76. We agree. CNG and Pennco contend that the trial court erred in reaching its decision by admitting into evidence an unrecorded buy-sell agreement to establish the inseparableness of the property and mineral sales needed to support the trial court's conclusions. They argue that as third-parties their rights can not be affected by an unrecorded instrument. We need not reach this evidentiary question. In the recorded property sale from Thompson to Rodgers it is specifically stated that the sale was made subject to an earlier recorded mineral reservation. Thus, from the public records CNG and Pennco could have determined what mineral interest was actually reserved in the original transaction between the Kellys and Thompson. Additionally, the subsequent recordation of Rodgers' sale of minerals without warranty to Thompson should have alerted CNG and Pennco of the possibility that this constituted the sale of a future reversionary mineral interest, a violation of the public policy enumerated in Article 76 of the Mineral Code. Therefore, even without the benefit of the unrecorded buy-sell agreement, we find the connexity of the two transactions sufficiently established in the public records to support the trial court's conclusion *791 that this constituted an indirect method of circumventing Article 76.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed one-half to CNG and one-half to Pennco.
AFFIRMED.
YELVERTON, J., dissents and assigns written reasons.
YELVERTON, Judge, dissenting.
The other members of this panel are effectively writing out of existence Articles 77, 78 and 79 of the Louisiana Mineral Code. These articles provide for the application of the after-acquired title doctrine to oversales of mineral servitudes, and provide rules concerning the conditions under which the doctrine will operate.
The facts of this case fit the conditions for application of those rules like a glove. In 1975 there was an outstanding mineral servitude on this property. Article 77 says that if a party purports to acquire a mineral servitude from a landowner when the right purportedly acquired is outstanding in another and the landowner either subsequently acquires the outstanding right or is the owner of the land at the time it is extinguished, the after-acquired title doctrine operates to vest the right in the party who purported to acquire it to the full extent of his title. In 1975 when the Thompsons sold the land to Rodgers the Thompsons did not own the minerals. When Rodgers purported to sell the minerals to the Thompsons, Rodgers did not own the minerals. However, by means of that purported sale of minerals, a party (Thompsons) purported to acquire a mineral servitude from a landowner (Rodgers) when the right was outstanding in another. When it came to pass on October 22, 1978 (the date the outstanding right was extinguished), that Rodgers was still the owner of the land, the conditions of Article 77 were met to vest a mineral servitude in the Thompsons, by application of the after-acquired title doctrine. Only by completely ignoring Article 77 can any other result be obtained.
There is a requirement that laws on the same subject matter must be interpreted in reference to each other. La.C.C. art. 13. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La.C.C. art. 9. Although Article 76 prohibits dealing with the landowner's expectancy in the extinction of a servitude as an object of commerce, Articles 77 through 79 give effect to oversales under certain conditions through the application of the after-acquired title doctrine. I believe these articles can live together.
The majority opinion strikes down the second transaction on April 4, 1975, which was the sale of the mineral servitude from Rodgers to the Thompsons, as being but a step in a sequence of transactions that amounted to an indirect reservation of the minerals by the Thompsons. I submit that such a reformation of the contracts between the parties is not permissible. Parties are free to contract for any object that is lawful, possible, and determined or determinable. La.C.C. art. 1971. The majority says the parties couldn't do what they did because they knew what they were doing. This somehow supposedly made it illegal. I find nothing simulated or illicit about what the parties did on April 4, 1975. In the first transaction that day, the Thompsons sold Rodgers 1,500 acres of land. In the second transaction Rodgers, then the owner of the land, entered into an oversale of the minerals with the Thompsons. The comments to Article 77 of the Mineral Code suggest that parties may enter into an oversale of minerals knowingly and deliberately. The comments point out that the way these articles are written, permitting deliberate entry into oversale transactions cannot result in the creation of real rights burdening the land for periods greater than 10 years, which was the danger foreseen and obviated by the supreme court in preventing dealings with the "reversionary right" in Hicks v. Clark, 225 La. 133, 72 So.2d 322 (1954). Article 76 of the Mineral Code is simply a codification of the policy announced in Hicks v. Clark. The comments to Article 79 point out that Article *792 79 is designed to prevent parties entering deliberately into an oversale from effectively burdening the land with a mineral servitude for a period greater than 10 years. The fact that these parties deliberately entered into an oversale does not make it wrong. Nor did their choice of transactional mechanics. The transaction was not a reservation of the minerals by Thompson. It was an oversale of the minerals by Rodgers.
The majority declares "there was no true oversale of minerals since there existed no present mineral rights which Rodgers could convey". This remarkable statement gees while Article 77 haws: the article expressly contemplates a situation where a "party purports to acquire a mineral servitude from a landowner when the right purportedly acquired is outstanding in another".
The majority recognizes that Article 77 is based on the principle of warranty and that its applicability is premised on a breach of contract by the seller who has represented to a buyer that he is selling more than he owns, i.e., an oversale. The case of St. Landry Oil & Gas Co. v. Neal, 166 La. 799, 118 So. 24 (1928) defines after-acquired title: "Where one sells the property of anotherand the rule is equally applicable to the granting or sale of mineral leases and later acquires title to the property sold by him, the title vests immediately in his vendee." The conveyance under attack here was a sale; the conveyancing language says so; and what was conveyed was "all of the oil, gas and other minerals lying on or under the ... property". Although there was a particular agreement as to warranty, it being agreed that Rodgers was not subject to warranty, this agreement did notcould notfree Rodgers from the warranty against his own act. It must be remembered that Rodgers and his assigns are the plaintiffs herein. The majority concludes that the warranty was "appropriately limited" because the mineral purchaser knew that the mineral seller did not own all the minerals. What difference does that make? How does that fact somehow lessen Rodgers' accountability for what results from his personal act? La.C. C. art. 2504 reads:
"Although it be agreed that the seller is not subject to warranty, he is, however, accountable for what results from his personal act; and any contrary agreement is void."
The agreement excluding warranty freed him from any warranty against the act of third persons, but the agreement did not free Rodgers from the warranty against his own act. See 2 M. Planiol, Civil Law Treatise pt. 1, nos. 1471 and 1475 at 824 and 826 (11th ed. La.St.L.Inst. trans. 1959). Article 2504 declares that any agreement contrary to the seller's warranty against his personal act is void.
The majority does not mention C.C. art. 2504, but by permitting Rodgers to get away with this suit to declare him the owner of the minerals, the majority must think the article has no application in this case. For this Civil Code article not to apply, one of two premises must be established: either the transaction was not a sale at all, or, if it was a sale, it was absolutely void as a violation of Mineral Code Article 76. To find that this was not a sale is to ignore the plain language of the contract. To find that if it was a sale, it was in violation of Mineral Code Article 76, is to ignore the plain language of Mineral Code Articles 77, 78, and 79.
I respectfully dissent.
NOTES
[1] Rodgers also sued Donald R. Allen, James R. Landrem, Walter H. Claiborne, II, I.J. Anderson, Timothy J. Mahoney, Sammy S. Pyle, and Gary S. Dunlap, the assigns of various overriding royalty interests from CNG and Pennco. CNG and Pennco were the only defendants who appealed.