# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #027

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **26th day of June, 2019**, are as follows:

**PER CURIAM**:

2018-C-0950      W&T OFFSHORE, L.L.C. v. TEXAS BRINE CORPORATION AND TEXAS BRINE
    C/W          COMPANY, L.L.C.    C/W    TEXAS BRINE COMPANY, L.L.C.  v.  W&T
2018-C-0956      OFFSHORE, L.L.C. (Parish of Lafourche)

The judgment of the court of appeal is reversed insofar as it held Texas Brine Corporation and Texas Brine Company, L.L.C. committed a trespass and were liable for damages. The judgment of the district court dismissing W&T Offshore, L.L.C.'s trespass and damage claims with prejudice is reinstated. In all other respects, the judgment of the court of appeal is affirmed.

REVERSED IN PART.

JOHNSON, C.J., dissents.
WEIMER, J., dissents and assigns reasons.
CLARK, J., dissents.

06/26/19

# SUPREME COURT OF LOUISIANA

## No. 2018-C-0950

## CONSOLIDATED WITH

## No. 2018-C-0956

## W&T OFFSHORE, L.L.C.

## VERSUS

## TEXAS BRINE CORPORATION AND TEXAS
## BRINE COMPANY, L.L.C.

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
## FIRST CIRCUIT, PARISH OF LAFOURCHE

**PER CURIAM**

In these consolidated applications, Texas Brine Corporation and Texas Brine Company, L.L.C. seek review of a judgment of the court of appeal which reversed the judgment of the district court insofar as it dismissed the claims of W&T Offshore, L.L.C. for trespass and damages. *W&T Offshore, L.L.C. v. Texas Brine Corp.*, 2017-0574 (La. App. 1 Cir. 5/10/18), 250 So.3d 970, 981. We granted certiorari and received briefing and oral argument from the parties. *W&T Offshore, L.L.C. v. Texas Brine Corp.*, 2018-0956 (La. 10/8/18), 253 So.3d 788, and 2018-0950 (La. 10/8/18), 253 So.3d 788.

Considering the highly unique facts and unusual circumstances of this case, a majority of this court has determined the district court did not err in dismissing the trespass and damage claims asserted by W&T Offshore, L.L.C. In reaching this conclusion, we emphasize our holding is limited to the precise and narrow facts before the court and should not be interpreted expansively beyond the specific factual confines presented.

**DECREE**

The judgment of the court of appeal is reversed insofar as it held Texas Brine Corporation and Texas Brine Company, L.L.C. committed a trespass and were liable for damages. The judgment of the district court dismissing W&T Offshore, L.L.C.'s trespass and damage claims with prejudice is reinstated. In all other respects, the judgment of the court of appeal is affirmed.

SUPREME COURT OF LOUISIANA

No. 2018-C-0950

CONSOLIDATED WITH

No. 2018-C-956

W&T OFFSHORE, L.L.C.

VERSUS

TEXAS BRINE CORPORATION AND TEXAS BRINE
COMPANY, L.L.C.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF LAFOURCHE

JOHNSON, Chief Justice, dissents.

**06/26/19**

## SUPREME COURT OF LOUISIANA

### NO. 2018-C-0950

### CONSOLIDATED WITH

### No. 2018-C-0956

### W&T OFFSHORE, L.L.C.

### VERSUS

### TEXAS BRINE CORPORATION AND TEXAS BRINE COMPANY, L.L.C.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF LAFOURCHE*

**WEIMER, J.**, dissenting.

For nearly two centuries, Louisiana has maintained, as a cardinal rule[1] of civilian property law, that doubt as to the existence, extent, or manner of exercise of a predial servitude should be resolved in favor of the servient estate. The Latin phrase *in favorem libertatis* (which can be traced back to antiquity through the laws of Spain, France, and Rome which form Louisiana's civilian legal heritage) has become enshrined as a blackletter[2] provision of the Louisiana Civil Code.[3] This bedrock civilian property law principle was not altered in 1976 with the adoption of the law of limited personal servitudes and, specifically, rights of use.[4] Nonetheless, the per curiam does not apply this fundamental civilian property law concept in the

---

[1] See 3 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE: PERSONAL SERVITUDES § 8:6, 534 (5th ed. 2011); see also La. C.C. art. 730; La. C.C. art. 753 (1870); La. C.C. art. 749 (1825).

[2] "Blackletter law" is "[o]ne or more legal principles that are old, fundamental, and well settled." BLACK'S LAW DICTIONARY 180 (8th ed. 2004).

[3] See 3 YIANNOPOULOS, *supra*; see also La. C.C. art. 730, 1977 Revision Comment (b).

[4] See 3 YIANNOPOULOS, *supra*.

context of interpreting a right of use for "a pipeline." Because the per curiam erodes, rather than preserves, this long-held principle of the state's rich civil law heritage and has the potential to detrimentally impact the rights of landowners throughout the state, I am compelled to respectfully dissent.

**Factual Background**

In 1979, the owners of the property in question entered into a "Salt and Underground Storage Lease" agreement that granted a right of use for a pipeline in favor of the mineral lessee, Texas Brine Corporation. A pipeline was constructed on the property in 1980 and has since been used for the transportation of salt and salt brine across the property. In 1993, W&T Offshore, L.L.C., purchased an undivided interest in the property, subject to the right of use. In 2014, Texas Brine desired to construct a replacement pipeline due to the obsolescence of the original pipeline. Negotiations with the co-owners of the property ensued. W&T declined to be a party to a 2015 "Pipeline Right-of-Way" agreement that was executed in favor of Texas Brine by the other co-owners. Despite the lack of unanimity among co-owners, Texas Brine constructed a significantly larger volume replacement pipeline in a different location on the property in accordance with the 2015 right-of-way agreement with the other co-owners.

This case addresses whether the right-of-use provision contained in the 1979 lease, which authorized the construction of "a pipeline" on a portion of the property, allows for the construction of a replacement pipeline with a larger diameter in another location on the property.

**We begin, as we must, with the words of the code.**

In reviewing the law on rights of use, civilian methodology and the Civil Code instruct that the sources of law are legislation and custom and legislation is the

2

superior source of law.  La. C.C. arts. 1 and 3.  <u>See</u> **Wede v. Niche Mktg. USA, LLC**, 10-0243, p. 7 (La. 11/30/10), 52 So.3d 60, 64.  Legislation, which is defined as the solemn expression of legislative will (La. C.C. art. 2), is to be interpreted according to the rules set forth in the Civil Code.  La. C.C. arts. 9-13.  <u>See</u> **Wede**, 10-0243 at 7, 52 So.3d at 64.  Chief among those rules is the admonition in La. C.C. art. 9 that "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."  Additionally, La. C.C. art. 11 instructs that "[t]he words of a law must be given their generally prevailing meaning."  Further, La. C.C. art. 13 provides: "Laws on the same subject matter must be interpreted in reference to each other."  Reading the various codal provisions involved and giving effect to each is the key to resolving this matter.  <u>See</u> **Wede**, 10-0243 at 7, 52 So.3d at 64.

We begin, therefore, with the words of the applicable codal provisions–La. C.C. arts. 639 through 645.  Central to the resolution of this case is La. C.C. art. 642, which provides:

> A right of use includes the rights contemplated or necessary to enjoyment at the time of its creation as well as rights that may later become necessary, provided that a greater burden is not imposed on the property unless otherwise stipulated in the title.

Although La. C.C. art. 642 has been the law since 1977,[5] courts have rarely been called on to evaluate this codal provision.

Texas Brine argues that Article 642 displaced the general predial servitude provisions that favor an interpretation of virtually unrestricted use of the servient estate by affording a superior right to the personal servitude holder similar to the German and Greek provisions (B.G.B. § 1091 and Greek Civil Code art. 1189, respectively, quoted *infra*) on which Article 642 is reportedly based. See La. C.C. art. 642, 1976 Revision Comment. Although the German and Greek codal provisions favor the owners of the right of use, Texas Brine's argument overlooks the difference in the language of La. C.C. art. 642 and the Greek and German codal provisions.[6]

Admittedly, La. C.C. art. 642 begins by extending the rights of the holder of a limited personal servitude. Its reference to "the rights contemplated or necessary

_____

[5] Prior to the 1976 revisions to the Louisiana Civil Code, the Code did not specifically recognize a personal right of use. There was debate as to whether a personal right of use could be created by contract. The question of whether parties could "create personal servitudes other than usufruct, use, or habitation had been raised in a number of Louisiana cases" and resolved jurisprudentially in favor of allowing the parties contractual freedom to do so. See La. C.C. art. 639, 1976 Revision Comment (d) (citing **Frost-Johnson Lumber Co. v. Salling's Heirs**, 150 La. 756, 864, 91 So. 207, 245 (1920); **Mallet v. Thibault**, 212 La. 79, 31 So.2d 601, 604 (1947); and **Simoneaux v. Lebermuth & Israel Planting Co.**, 155 La. 689, 99 So. 531 (1924)). In keeping pace with what was occurring in society and the developing jurisprudence, the Louisiana Legislature passed 1976 La. Acts 103, § 1, effective January 1, 1977, and enacted La. C.C. arts. 639 through 645, giving legislative recognition to the personal servitude of right of use within the Civil Code. See La. C.C. art. 639, 1976 Revision Comment (a) (the codal recognition of a right of use in the Civil Code required the enactment of new provisions).

[6] The English translation for B.G.B. § 1091 provides:

> The scope of a restricted personal easement is determined in case of doubt by the personal need of the person entitled.

https://www.gesetze-im-internet.de/englisch_bgb/englisch_bgb.html#p4209 (3/15/2019).

The English translation for Greek Civil Code art. 1189 provides:

> In case of doubt the extent of a limited personal easement shall be determined having regard to the personal needs of the beneficiary.

GREEK CIVIL CODE 169 (Constantin Taliadoros trans., Ant. N. Sakkoulas Publishers, 2000).

to enjoyment at the time of its creation as well as rights that may later become necessary" is similar to the Greek and German provisions in which the needs of the person having the right of use are recognized. However, the "proviso clause" which follows ("provided that a greater burden is not imposed on the property") imposes a restriction and modification on the rights of the servitude holder.

Where there is a gap in the laws on rights of use, La. C.C. art. 645, a sibling article to La. C.C. art. 642, directs:

> A right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude.

Thus, the codal provisions related to predial servitudes should be consulted when evaluating rights of use. Specifically on point is La. C.C. art. 730, titled "Interpretation of servitude," which states: "Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."[7]

One year after the enactment of the rights-of-use provisions, the legislature in 1977 La. Acts 514, § 1, effective January 1, 1978, amended and reenacted the laws on predial servitudes, reproducing the substance of La. C.C. art. 753 (1870) in La. C.C. art. 730–indicating there was no intent to change the law. See La. C.C. art. 730, 1977 Revision Comment (a).[8] In pertinent part, the 1977 Revision Comments to La. C.C. art. 730, obviously penned by the late Professor A.N. Yiannopoulos,[9] provide:

---

[7] Although urged by W&T, La. C.C. art. 730 does not appear to have been considered by the lower courts on which the per curiam relies.

[8] This codal provision, in turn, can be traced back to La. C.C. art. 749 in the Code of 1825.

[9] See 3 YIANNOPOULOS, *supra*, which virtually replicates the revision comments. Noteworthy is the following, which is contained in the chapter of the treatise (Chapter 8, Part I, titled "Limited personal servitudes") specifically addressing La. C.C. art. 642 and rights of use:

> Another cardinal rule of interpretation is that a doubt "as to the existence,

5

(b) It is a cardinal rule of interpretation that, in case of doubt, instruments purporting to establish predial servitudes are always interpreted in favor of the owner of the property to be affected. The rule incorporates into Louisiana law the civilian principle that any doubt as to the free use of immovable property must be resolved *in favorem libertatis*. See Domat, Les lois civiles dans leur ordre naturel, 1 Oeuvres de Domat 329 (ed. Remy 1828); 2 Toullier, Droit civil français 192 (1833). The Louisiana Supreme Court has repeatedly declared that "servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law." **Parish v. Municipality No. 2**, 8 La.Ann. 145, 147 (1853), cited with approval in **Buras Ice Factory, Inc. v. Department of Highways**, 235 La. 158, 103 So.2d 74 (1958). See also **McGuffy v. Weil**, 240 La. 758, 767, 125 So.2d 154, 158 (1960): "any doubt as to the interpretation of a servitude encumbering property must be resolved in favor of the property owner." The rule that the proper interpretation of an ambiguous instrument is that which least restricts the ownership of the land has been applied by Louisiana courts in a variety of contexts. See, e.g., **Whitehall Oil Co. v. Heard**, 197 So.2d 672 (La.App.3rd Cir.), writ refused, 250 La. 924, 199 So.2d 923 (1967) (determination of the question whether a landowner created a single servitude over contiguous tracts or a series of multiple interests).

(c) "Servitudes claimed under titles, are never sustained by implication–the title creating them must be express, as to their nature and extent, as well as to the estate to which they are due." **Parish v. Municipality No. 2**, 8 La.Ann. 145, 147 (1853), cited with approval in **Buras Ice Factory, Inc. v. Department of Highways**, 235 La. 158, 103 So.2d 74 (1958).

La. C.C. art. 730, 1977 Revision Comments (b) and (c).

The interpretation suggested by Texas Brine, and accepted by the lower courts and affirmed by this court's per curiam as to the pipeline at issue in this case,[10] relies

---

extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." This rule incorporates into Louisiana law the civilian principle that ownership is presumed to be free of burdens and that any doubt as to a burden must be resolved *in favorem libertatis*. The Louisiana Supreme Court has repeatedly declared that "servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law." It follows that "servitudes claimed under titles, are never sustained by implication-the title creating them must be express, as to their nature and extent, as well as to the estate which owes them, and the estate to which they are due." [Footnotes omitted.]

3 YIANNOPOULOS, LA. CIV. L. TREATISE: PERSONAL SERVITUDES § 8:6, 534.

[10] In interpreting La. C.C. art. 642, quoted *infra*, the district court found that the codal language "is susceptible of different meanings; specifically, whether the article's clause concerning greater burdens modifies the entire text or rather just those rights that later become necessary." The district

on the similarities between the first portion of La. C.C. art. 642 and the Greek and German codal provisions, but ignores the proviso clause. Clearly, the Louisiana Legislature did not intend for La. C.C. art. 642 to be as expansive as the German and Greek codal provisions. If the Louisiana Legislature had, there would have been no need to add the proviso clause. In summary, although Article 642, in its first part, expands the rights of the holder of a right of use by including "the rights contemplated or necessary to enjoyment at the time of creation as well as the rights that may later become necessary," the servitude holder's rights are limited by the ensuing clause "provided that a greater burden is not imposed on the property." The modifying proviso is consistent with the long recognized civilian principle *in favorem libertatis* embodied in La. C.C. art. 730. Clearly, La. C.C. art. 642 was not designed to completely abolish the longstanding civilian predial servitude principle in the context of limited personal servitudes to the detriment of the landowner and benefit of the servitude holder. The second clause in La. C.C. art. 642, the proviso, is followed by a recognition of the parties' freedom to contract otherwise ("unless otherwise stimulated in the title").

Texas Brine contends that it had the right to construct a larger replacement pipeline under the 1979 agreement and under La. C.C. art. 642. Accordingly, the agreement between the parties should be evaluated, applying blackletter law, and the

---

court further stated:

> Because article 642 is primarily an expansion, rather than restriction, of rights granted under rights-of-use, the Court holds that the "greater burden" language of the article does not modify those rights that were contemplated or necessary to the enjoyment of the right of use at the time of its creation. This construction is necessary since it "best conforms to the purpose of the law."

Accordingly, the district court found it unnecessary to determine whether Texas Brine's replacement pipeline imposed a greater burden on the Brown property. The appellate court's interpretation of La. C.C. art. 642 also did not involve a determination of the greater burden issue.

7

cardinal rule of interpretation in favor of the owner of the property to be affected to determine if the agreement afforded Texas Brine the right to construct replacement pipelines in the future.

**Analysis of the Applicable Provisions in the Agreement**

The 1979 lease agreement was for a term of "ten (10) years (the 'primary term') from the date entered into and so long thereafter as salt or salt brine are produced from" the leased property. The provision in the lease agreement that creates the right of use in question provides:

> Lessee shall have the right to **construct, operate and maintain a pipeline for the transportation of brine** over and across additional property of Lessor comprising the North one-half (½) of Section 64 and all of Section 59, Township 15 South, Range 15 East, Parish of LaFourche, Louisiana, **on such portion of the property as designated by Lessee and as approved by Lessor**, such approval not to be unreasonably withheld. Lessee shall pay an additional consideration of ONE HUNDRED AND NO/100 ($100.00) DOLLARS per rod for such pipeline right-of-way. [Emphasis added.]

The agreement does not indicate the anticipated life span of the pipeline or the estimated term for production of salt or salt brine, nor does it directly address larger replacement pipelines.

The rules of contract interpretation dictate that intent is determined by the words of a contract. See La. C.C. art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.").

Applying the literal language, the clear and explicit words of the agreement contemplated construction of "a pipeline." The words of the agreement specify a single pipeline, not multiple pipelines. With the construction of a larger replacement pipeline on the landowner's property, where there was previously "a pipeline," there are now "two pipelines." The fact that only one of the pipelines is actually being used

8

to transport brine over and across the landowner's property does not detract from the fact that there are now two pipelines on the property. Two pipelines are twice the number and twice the burden on the property authorized by the agreement. The right-of-use provision in the lease agreement is simplistically clear and explicit–only "a pipeline" is contemplated.

Nonetheless, in the absence of a limitation on the size or specification of the location of the pipeline, Texas Brine argues, and the courts have agreed, that Texas Brine has broad rights under the 1979 right-of-use provision to determine the size and placement of the pipeline. However, the right-of-use provision directs that the pipeline is to be located on a "portion" of the specified area.[11] Again, a single portion of the property is to be burdened with a pipeline, not various portions of the property burdened with numerous pipelines. Clearly, the right-of-use provision does not make the entirety of the specified area available to Texas Brine for placement of the original pipeline and, thereafter, subject the property to construction of replacement pipelines desired by Texas Brine in the future. Upon the placement of the original pipeline in 1980 (based on Texas Brine's designation and the landowner's consent) the exact location and the extent and width of Texas Brine's servitude was made certain, limiting the servitude to the smaller area actually needed for the construction of the single, original pipeline.[12] See **J.C. Trahan Drilling Contractor, Inc. v. Younger**, 169 So.2d 15, 18 (La.App. 2 Cir. 1964); **Dickson v. Arkansas Louisiana Gas Co.**, 193 So. 246, 249 (La.App. 2 Cir. 1939). The facts establish that Texas

---

[11] "A predial servitude may be established on a certain part of an estate, if that part is sufficiently described." La. C.C. art. 727.

[12] Here, the agreement specified that the location of the pipeline servitude would be designated by the servitude holder subject to the approval of the landowner. This agreement contemplated the location of a pipeline, not multiple pipelines.

Brine's pipeline servitude was 9,000 feet long and 14 inches in diameter, with the right of ingress and egress for the purpose of operations under the lease.

Other language in the right-of-use provision corroborates that "a pipeline" was meant to be one pipeline. The agreement establishes the right to "construct, operate and maintain a pipeline for the transportation of brine." "Maintain" is "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline (~ machinery)." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 718 (1988). The NEW OXFORD AMERICAN DICTIONARY 1030 (2001) defines "maintain" as "keep (a building, machine, or road) in good condition or in working order by checking or repairing it regularly." Constructing the new larger, replacement pipeline in a completely different location is not consistent with an agreement that bestowed the right to "maintain a pipeline."

The appellate court correctly recognizes that "the 1979 lease does not include specific language regarding the replacement of the original pipeline" due to obsolescence.[13] **W & T Offshore, L.L.C. v. Texas Brine Corp.**, 17-0574, 17-0575, p. 14 (La.App. 1 Cir. 5/10/18), 250 So.3d 970, 979. However, the language in the right-of-use provision of the lease agreement is "clear and explicit" as to the rights granted to Texas Brine. Pursuant to the right-of-use provision, Texas Brine's rights were limited to "the right to construct, operate and maintain a pipeline for the transportation of brine." Any uncertainty as to the extent and manner of Texas Brine's 1979 right of use was made certain by the construction of the original

---

[13] The court of appeal quoted a portion of the 1979 lease agreement that referenced "pipe lines." Read in context, this does not address the original main pipeline located within the right of use and clearly does not contemplate a larger replacement pipeline in another location. In context, the reference to "pipe lines" is apparently a reference to ancillary pipelines constructed in conjunction with the original main pipeline. **W & T Offshore, L.L.C. v. Texas Brine Corp.**, 17-0574, 17-0575, p. 14 (La.App. 1 Cir. 5/10/18), 250 So.3d 970, 979.

pipeline.[14]  Pursuant to the express language in the right-of-use provision, Texas Brine did not have authority to construct a replacement pipeline, much less a larger replacement pipeline in another location.  A contrary interpretation of the 1979 right-of-use agreement would result in the sustaining of a servitude claimed under title by implication, which is not allowed.[15]  Since only the right to "construct, operate and maintain" were granted to Texas Brine by the right-of-use provision, Texas Brine did not have the right to replace the existing pipeline under the terms of the 1979 right-of-use provision.

Accordingly, as written, the agreement does not obligate the landowner to gratuitously provide the servitude holder with additional land for a replacement pipeline if and when the original pipeline can no longer be safely used to transport brine.  Since the language in the right-of-use provision of the lease agreement is "clear and explicit," there is no need to consider extrinsic evidence to determine what was contemplated at the time of the creation of the lease.[16]  See La. C.C. art. 2046 (quoted *supra*).

_____

[14]  See **J.C. Trahan Drilling Contractor, Inc.**, 169 So.2d at 18; **Dickson**, 193 So. at 249.

[15]  Under the law, "[s]ervitudes claimed under titles, are never sustained by implication–the title creating them must be express, as to their nature and extent, as well as to the estate to which they are due."  La. C.C. art. 730, 1977 Revisions Comment (citing **Parish**, 8 La.Ann. at 147, cited with approval in **Buras Ice Factory, Inc.**, 235 La. 158, 103 So.2d 74).  Further, as noted, the 1979 right-of-use provision provided for "a pipeline" across a "portion" of the property, and the "extent and manner of use" were fixed at construction of the original pipeline.

[16]  The court of appeal referenced La. C.C. art. 749, which provides:

> If the title is silent as to the extent and manner of use of the servitude, the intention of the parties is to be determined in the light of its purpose.

Notably, Article 749 is placed in Section 4 of the "Conventional or Voluntary Servitudes" Chapter, which governs the "Rights of the Owner of the Dominant Estate."  With a right of use, there is no dominant estate.  Thus, the applicability of La. C.C. art. 749 in this case is questionable.  Regardless, as noted, the 1979 agreement is not "silent" but provides for "a pipeline" across a "portion" of the property, and the "extent and manner of use" were fixed at construction of the original pipeline.

Based on the testimony of a representative of a majority of the co-owners, Texas Brine suggests that the landowners were aware that salt causes corrosion, implying that the landowners had knowledge at the time the agreement was executed that the pipeline would have to eventually be replaced.[17] Such implication is then used to support the proposition that the need for a replacement pipeline was "contemplated or necessary to enjoyment [of the pipeline right of use] at the time of its creation." See La. C.C. art. 642. Notably, even conceding W&T is sophisticated on the corrosive effects of brine, W&T did not acquire an interest in the property until 1993; therefore, its knowledge is irrelevant as to what was "contemplated" when the agreement was signed in 1979. Notably, an expert witness in the field of chemical engineering and brine pipeline operations testified:

> the life expectancy of the carbon steel brine pipeline, installed on the pipeline right-of-way in this case in 1980, was minimally twenty years, but with good maintenance more than thirty years of use was possible, and … these facts were known at the time the pipeline was installed.

However, the fact that it was "known" in 1980 that the life expectancy of the pipeline constructed by Texas Brine was 20 to 30 years does not prove that the parties to the agreement, particularly the landowners, had knowledge of this fact when the agreement was executed. Additionally, based on a recent estimate by Texas Brine, the district court held that the reserves in the salt domes were "capable of production for potentially two centuries or more because of the indeterminate nature of the lease." **W&T Offshore, L.L.C.**, 17-0574 at 13, 250 So.3d at 978. Again, the record is devoid as to whether Texas Brine, much less the landowners, knew in 1979 that the

---

[17] The only record evidence is that a representative of some of the co-owners was aware that salt is corrosive. A bare statement about the corrosive nature of salt falls far short of establishing the parties contemplated a pipeline would have to be replaced when the right-of-use provision states Texas Brine has the right to "maintain a pipeline." Notably, the property in question is owned in indivision by more than 30 co-owners, with W&T being, by far, the largest individual co-owner (23.6 percent).

salt dome could produce for more than 200 years and that an agreement for "a pipeline" would morph into larger replacement pipelines.

This evidence demonstrates Texas Brine constructed a pipeline with planned obsolescence, and there is no evidence that the landowners had expertise or knowledge that an initial pipeline had a finite life and would eventually leak and contaminate their property and be destined for a cycle of replacement, thus, further burdening their property.

Furthermore, it is Texas Brine that is charged (as the entity most knowledgeable about the corrosive nature of salt, its adverse impact on a pipeline, and the potential for environmental hazard due to leakage) with confecting an agreement to expressly provide for the eventual replacement of the pipeline authorized by the 1979 right-of-use provision. Under the terms of the agreement as written, it was Texas Brine's responsibility to construct a pipeline from materials that would not be adversely impacted by the corrosive effects of salt.

Additionally, that the 1979 agreement is, at a minimum, ambiguous was recognized in a Texas Brine corporate document, consisting of an internal email stating "the verbiage is extremely ambiguous and unclear." This conclusion was concurred in by "two of corporate attorneys in-house counsel [sic]." Obviously, this conclusion prompted Texas Brine to purchase another pipeline right-of-way in 2015 from some of the landowners for the replacement pipeline.

In my view, the language in the 1979 right-of-use provision clearly and explicitly limits Texas Brine to "a pipeline." However, if the right-of-use provision is unclear or ambiguous as to whether the 1979 agreement afforded Texas Brine the right to always have a functioning and operational pipeline, the cardinal rule of La. C.C. art. 730 applies and dictates that "the existence, extent, or manner of the exercise

13

of the servitude shall be resolved in favor" of the owner of the property to be affected. "[E]xtremely ambiguous and unclear" language cannot lead to an unbounded, ever expanding, servitude right imposed on the property.

Because the "extremely ambiguous and unclear" language of the 1979 agreement did not allow for the construction of a second pipeline a short distance from the original pipeline, Texas Brine negotiated in the latter part of 2014 for the purchase of a new servitude for $400 per rod. By January 8, 2015, the owners of an undivided 76.34 percent interest in the land had entered into a "Pipeline Right-of-Way" agreement at double the rate offered by Texas Brine, $800 per rod.[18] Acting well within its rights, W&T, the largest co-owner (23.66 percent) of this property, declined to sign the new servitude agreement because of unresolved storage and indemnification issues.[19]

The 2015 "Pipeline Right-of-Way" agreement (negotiated with the other co-owners of the property) granted Texas Brine "a non-exclusive right of way and easement," with "a permanent width of thirty feet (30')" and including:

> the right to lay, construct, maintain, replace, change the size of, move, remove and operate a single pipeline not to exceed eighteen inches (18") in diameter upon completion, and no more than twenty-four (24") inches upon completion of a replacement pipeline ... for the transmission of brine and other fluids or substances.

---

[18] See La. C.C. art. 801 ("The use and management of the thing held in indivision is determined by agreement of all the co-owners."); La. C.C. art. 804 ("Substantial alterations or substantial improvements to the thing held in indivision may be undertaken only with the consent of all the co-owners."); La. C.C. art. 805 ("A co-owner may freely lease, alienate, or encumber his share of the thing held in indivision. The consent of all the co-owners is required for the lease, alienation, or encumbrance of the entire thing held in indivision.").

[19] W&T was well within its rights to use the so-called "extremely ambiguous and unclear" right-of-use provision to negotiate other concessions in the agreement. W&T was placed in this position because the 1979 right-of-use provision did not authorize the construction of a replacement pipeline or, alternatively, because the 1979 right-of-use provision was vague. The previously noted email reveals that, despite knowledge that the 1979 agreement was ambiguous regarding Texas Brine's right to construct a replacement pipeline, Texas Brine took the position, with the landowners, that no "further agreements, ROW, etc." were necessary, thereby engaging in the same type of negotiation tactics as W&T.

14

In the 2015 agreement, Texas Brine was careful to describe the width of the servitude and specify the allowed diameter of the pipeline in the right-of-way agreement. Rather than limiting its rights to the construction, operation and maintenance of a pipeline as it did in the 1979 agreement, Texas Brine was granted "the right to lay, construct, maintain, replace, change the size of, move, remove and operate a single pipeline." This language clearly and unambiguously would have provided, had it been included in the 1979 right-of-use provision of the lease agreement, the right to replace the original 14-inch pipeline with an 18-inch pipeline eight feet away from the site of the original pipeline. The acknowledged "extremely ambiguous and unclear" verbiage of the 1979 agreement had to be clarified in the 2015 agreement to allow another pipeline to be located on this property.

Eventually, Texas Brine attempted to purchase a new servitude adjacent and parallel to the original servitude to facilitate the construction of a new larger pipeline from the co-owners of the property for $435,664. To the co-owners of 76.34 percent, Texas Brine actually paid $333,274.68 to purchase the new 30-foot pipeline right-of-way on which it had the right to operate a single pipeline that could be replaced as needed in the future. Texas Brine contends it paid this money solely to maintain "goodwill" or "to foster a positive relationship with [the landowners] at their request." Noteworthy is the fact that the new servitude agreement was filed in the conveyance records on August 7, 2015, despite Texas Brine's contention that the 2015 agreement was unnecessary. In my view,[20] the facts amply demonstrate Texas Brine payed for an additional servitude because the 1979 right-of-use provision did not authorize the construction of an additional pipeline on the property. Under the

---

[20] Because there were errors in the legal analysis that interdicted the fact-finding process, the manifest error rule does not apply, and the facts are evaluated *de novo*. **Evans v. Lungrin**, 97-0541, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735.

1979 agreement, Texas Brine had only the right to locate "a pipeline" on the property and did not have the right to "replace, change the size of, move, [or] remove" the original pipeline as indicated in the 2015 right-of-way agreement.

## Application of La. C.C. art. 642

In the absence of an agreement by the parties in the 1979 document that allowed for the construction of a replacement pipeline, it is necessary to evaluate the facts of this case under La. C.C. art. 642.

As previously discussed, Article 642 does not recognize an expansion of rights in favor of the servitude holder if the replacement pipeline would result in the imposition of a "greater burden" on the property. Texas Brine argues that the replacement pipeline will not impact this property that is only used for mineral exploration, hunting, and fishing. Although Texas Brine urges that the landowner failed to introduce evidence on the greater burden issue, the record contains sufficient evidence to support a determination of this issue. The original pipeline constructed on the property was 14 inches in diameter and 9,000 feet in length, occupying slightly over 9,000 square feet of the property. By moving the replacement pipeline over eight feet from (and parallel to) the original pipeline, the servitude holder is now burdening another portion of the property–another 72,000 (width of 8 feet times length of 9,000) square feet at a minimum. Clearly, the construction of the replacement pipeline resulted in a "greater burden"[21] being imposed on this property, described as "freshwater marsh," and "a somewhat fragile ecosystem."[22]

---

[21] The codal provision (La. C.C. art. 642) does not refer to a "significant burden" or a "substantial burden," but merely to a "greater burden."

[22] "Far from being useless, disease-ridden places, wetlands provide values that no other ecosystem can. These include natural water quality improvement, flood protection, shoreline erosion control, opportunities for recreation and aesthetic appreciation and natural products for our use at no costs." https://www.epa.gov/wetlands/why-are-wetlands- important, Wetlands and People, United States Environmental Protection Agency (June 13, 2018). "The swamps and marshes of coastal Louisiana

16

Furthermore, the replacement pipeline is a larger 18-inch pipeline, which obviously takes up more space, resulting in a greater impact on the property during and following installation. As W&T suggested, and independent research confirms, the gallon per minute flow through the pipeline is substantially increased with the larger pipeline:

> [t]he area of a 14-inch pipe is 153.94 square inches, whereas the area of a 18-inch pipe is 254.47 square inches. The 100.53 square inch increase in area is a 65.3% increase.

W&T argues and Texas Brine does not rebut the fact safety concerns exist when the brine flow increases as much as 65.3 percent due to the larger replacement pipeline. This larger replacement pipeline located outside of the original footprint undeniably causes more of an environmental impact and imposes a "greater burden" on the servient estate, particularly when the replacement pipeline is constructed with planned obsolescence.

Furthermore, the fact that the fragile wetlands in question are only being used for brine production, hunting and fishing, and oil and gas operations does not allow for a more expansive interpretation of the right-of-use provision in the agreement or La. C.C. art. 642. In light of the language in the 1979 right-of-use provision, Texas Brine should have constructed "a pipeline" that was corrosion resistant and could be maintained in place instead of a pipeline that was designed to eventually fail.

---

are among the Nation's most fragile and valuable wetlands." Williams, S. Jeffress, https://pubs.usgs.gov/fs/la-wetlands/, Louisiana Coastal Wetlands: A Resource at Risk, United States Geological Survey Coastal and Marine Geology Program (March 7, 2019). "Louisiana's wetlands today represent about 40 percent of the wetlands of the continental United States, but about 80 percent of the losses." *Id*. Historically neglected, the immense value of Louisiana's wetlands has been recognized and massive efforts have been undertaken to preserve this valuable property. See *id*.; https://www.epa.gov/wetlands/why-are-wetlands-important. If the pipeline had to be replaced because it was adversely impacting the environment, one might question the wisdom of allowing another pipeline with a finite life, which would also require replacement in the future.

Proper care taken in initial construction will substantially lessen the adverse impact and allow pipelines and the wetlands to coexist.

**Secondary Sources Support the Clear Language of the Civil Code**

The language of La. C.C. art. 642, when read *in pari materia* with the other applicable codal provisions, is sufficiently clear. In the absence of an agreement by the parties that would give the servitude holder the right to construct a separate replacement pipeline in another location on the property, there is no need for further analysis. See La. C.C. art. 2046 (quoted *supra*). However, in an effort to be thorough, the legislative history has been reviewed and secondary sources have been examined, which confirm the codal analysis. See **Willis-Knighton Med. Ctr. v. Caddo-Shreveport Sales & Use Tax Comm'n**, 04-0473 (La. 4/1/05), 903 So.2d 1071, 1104-05 (Weimer, J., assigning additional reasons).

The fact that the rights-of-use laws, enacted in 1976, were not considered to be a sea change in the law of Louisiana, but rather merely a codification of what had been jurisprudentially recognized, comes from the words of the late Professor Yiannopoulos, who drafted the legislation and testified before the legislature in favor of adoption, explaining the articles of the proposed legislation. See 1976 Regular Session, Minutes of House of Representatives Committee on Civil Law and Procedure Meeting re Act 103 on June 8, 1976; 1976 Regular Session, Minutes of Senate Committee on Judiciary Section A Meeting re Act 103 on June 22, 1976. The sparse legislative history[23] indicates that these provisions passed through the legislature with only one negative vote and that the only amendments adopted were to add coauthors.

---

[23] The legislative history is unremarkable, which is contrary to what would be expected if the legislature intended to change what the late Professor Yiannopoulos referred to as the cardinal rule of interpretation of predial servitudes.

Writing in his treatise specifically on the newly adopted Articles 639 through 645, Professor Yiannopoulos devoted only a paragraph to Article 642, in which he mostly quoted the Article:

> According to Article 642 of the Louisiana Civil Code, the grant of a limited personal servitude "includes the rights contemplated or necessary to enjoyment at the time of the creation as well as rights that may later become necessary, provided that a greater burden is not imposed on the property unless otherwise stipulated in the title." This article was derived from the corresponding articles in the German Civil Code and in the Greek Civil Code. [Footnotes omitted.]

3 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE: PERSONAL SERVITUDES § 8:5, 531. If Article 642 represents a sea change as suggested by Texas Brine, such intent was apparently missed by Professor Yiannopoulos, its drafter. Had Article 642 completely altered the centuries old concept of Louisiana property law, Professor Yiannopoulos would have devoted more than a passing mention of the provision in his treatise and would not have recited the cardinal rule of interpreting predial servitudes in the context of limited personal servitudes. See 3 YIANNOPOULOS at § 8:6, 534 (quoted *supra* at, n.9). The reason Professor Yiannopoulos did not indicate this sea change occurred is because it did not.

Professor Yiannopoulos devoted substantially more of the limited personal servitude chapter of his treatise to clearly state the applicability of the cardinal rule of interpretation that, in case of doubt, instruments purporting to establish the personal servitude of right-of-use are like their ancestor predial servitudes, always interpreted "in favor of the servient estate" and "[t]his rule incorporates into Louisiana law the civilian principle … that any doubt as to a burden must be resolved *in favorem libertatis*." See 3 YIANNOPOULOS at § 8:6, 534 (quoted *supra* at n.9).

Furthermore, such a restrictive interpretation of Texas Brine's 1979 pipeline servitude is also consistent with longstanding appellate court jurisprudence that

19

establishes "[i]nsufficient descriptions as to the location or extent of a limited personal servitude may be remedied by actual use of the servitude over a certain area of the servient estate." See 3 YIANNOPOULOS at § 8:6, 535 (footnote omitted; citing **J.C. Trahan Drilling Contractor, Inc.**, 169 So.2d at 18–"Regardless of the failure to describe the exact location of the servitude at the time of the grants this failure was remedied by the construction of the pipeline. It follows that that which was uncertain has been made certain."). Therefore, once Texas Brine constructed the original pipeline, the exact location and the extent of the its right of use was set and made certain.[24]

The strict construction to be given to servitude agreements in favor of unrestricted use of property is illustrated in the factually similar case of **Dickson**, 193 So. 246, in which the servitude agreement provided:

> This right of way[25] is given to the said Company for the purpose of permitting it to construct across said land a gas main for the distribution of natural or artificial gas in supplying its consumers in the City of Shreveport, and shall be in perpetuity, provided that the said gas main so constructed by said Gas Company shall be not less than two feet below the surface of the ground and after placing said main said Company shall fill up and cover same so as to leave no holes where same is located. [Emphasis added.]
>
> The said Company being hereby granted the right to go on said lot for the purpose of making any repairs or alterations necessary for the maintenance of said gas main and shall at all times have access to the point where said gas main is laid.

*Id.*, 193 So. at 247. As contemplated by the servitude agreement in **Dickson**, a gas main was constructed along the specified route in 1907. In 1937, when the main began to leak, the servitude holder determined that a new replacement gas main was

---

[24] To hold otherwise would adversely impact title examinations and land titles. The "migrating" servitude approved by the per curiam would make it impossible to precisely locate servitudes on a parcel of land.

[25] In **Dickson**, the route for right of way was identified "in red on [an] attached blue print." *Id.*, 193 So. at 247.

necessary "to insure a safe and dependable distribution of gas" to patrons in that area. *Id.*, 193 So. at 247-48. The old gas main was abandoned upon the completion of the construction of the replacement gas main, which was placed parallel to the old one and about one foot (and in some "places considerably farther") from it. *Id.*, 193 So. at 248.

In determining whether the gas company was exercising a right expressly conferred in the servitude agreement as contended, the **Dickson** court examined the language of the agreement. After observing that "[t]he original grant of right of way permitted the laying of '*a gas main* for the distribution of natural or artificial gas' through the land," the **Dickson** court concluded that the servitude agreement did not contemplate or permit the laying of more than one main on the property. *Id.*, 193 So. at 248-49. The **Dickson** court astutely noted that the gas company's interpretation of the servitude agreement doubled the burden on the land. *Id.*, 193 So. at 249.

After finding the language of the servitude agreement to be unambiguous, the **Dickson** court found:

> By no stretch of the imagination can it be said that the right to lay or have more than one gas main across the land was created thereby. True it is, that the width of the right of way is not specified, but this does not alter the situation. The width necessary to make an excavation adequate to receive the main originally, determined the limits of the grantee's right in that respect, under said instrument.

*Id.*, 193 So. at 249. Accordingly, under the terms of the servitude agreement, the gas company did not have the "legal right to appropriate the land necessary to accommodate the new [second/replacement] line." *Id.*

Although **Dickson** and **Trahan** preceded the enactment of La. C.C. art. 642, the courts' analysis in those cases is appropriate to the resolution of this matter[26] notwithstanding the fact that neither of these cases involved obligations owed by a mineral lessee under the Louisiana Mineral Code.

**Conclusion**

Ultimately, the per curiam holds that one replacement of the original brine transportation pipeline would be allowed.[27]  I respectfully dissent from such an expansive interpretation of the right-of-use provision of the 1979 lease in favor of the servitude holder in violation of La. C.C. art. 730.  The per curiam effectively makes W&T a party to the 2015 pipeline right-of-way despite it not being a party to the agreement as required by La. C.C. arts. 801, 804, and 805.  Even if Texas Brine intended in 1979 to establish a right of use that allowed the construction of another larger pipeline in a different location, the language in the right-of-use provision of the 1979 lease was not drafted in such a manner so as to afford Texas Brine that right.

---

[26] **Dickson** was recently cited by this court with approval relative to "the effects of real obligations in connection with predial servitudes" in **Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.**, 10-2267, p. 46 n.78 (La. 10/25/11), 79 So.3d 246, 281 n.78.

[27]  The holding in the per curiam"is limited to the precise and narrow facts before the court and should not be interpreted expansively beyond the specific factual confines presented." **W&T Offshore, L.L.C. v. Texas Brine Company, L.L.C.**, 18-0950, 18-0956, slip op., p. 1 (La. 5/__/19). Accordingly, Texas Brine's rights beyond this one pipeline in this one location were not considered by the court.  Therefore, the jurisprudential value of this per curiam is limited to this pipeline in this case.

Because the per curiam limits itself to authorizing this one pipeline, the otherwise absurd result of multiple replacement pipelines crossing this property is avoided.  It would be irrational to think that if a second pipeline is authorized by La. C.C. art. 642, as found in the per curiam, then so too would La. C.C. art. 642 authorize the construction of a second replacement pipeline in a third location on the Brown property in 30 years when the life span of the replacement pipeline expires. Otherwise, the property could be burdened with six additional pipelines during the 200 years remaining of the salt dome's productive life.  The placement of six pipelines on this property, each a distance of eight feet from the last, would impose a burden on at least an additional 432,000 (72,000 square feet times six pipelines) square feet of this property, substantially broadening the area of possible contamination of this wetland area.

22

There is no proof to establish the parties contemplated (in 1979) the need for replacement of the brine transportation pipeline. The 1979 lease fails to expressly address the circumstances associated with the replacement of the brine transportation pipeline. Nonetheless, the clear and explicit language of the right-of-use provision establishes what the parties contemplated: "a pipeline" which Texas Brine had "the right to construct, operate and maintain" on a single portion of the property at the location where initially constructed.

Accordingly, the parties contemplated that this limited personal servitude, as a restraint on the free disposal and use of property, would not be viewed with favor by the law and would be construed to allow only a pipeline, not multiple pipelines. The parties contemplated that servitudes created by agreement "are never sustained by implication … [but] must be express, as to their nature and extent." **Parish**, 8 La.Ann at 147. The parties contemplated that the longstanding cardinal rule of Louisiana that any doubt as to the existence, extent or manner of the exercise of the agreement would be resolved *in favorem libertatis*. Lastly, the parties never contemplated a "greater burden" would be imposed on the property due to the construction of the original authorized pipeline that would ultimately leak, contaminate the property, and, by design, become obsolete, resulting in a harsh impact on the fragile ecosystem caused by the burial of a second, larger pipeline.[28]

Applying the still relevant ancient principles of civilian property law adopted by Louisiana, the parties contracted for a pipeline to be constructed, operated, and

---

[28] The issue to be resolved is discrete–the location of a pipeline, which is governed by the law of limited personal servitudes, specifically rights of use, and the applicable laws regarding predial servitudes. This case involves a specific clause in the agreement governed by specific provisions of the Civil Code. Mineral law does not apply to evaluate what the parties contemplated because the agreement regarding the right of use at issue in this case is clear and explicit.

maintained so as to not become a greater burden on the land. Applying the wisdom of these ancient principles, a pipeline and the fragile wetlands can coexist.

For these reasons, I respectfully dissent from the per curiam opinion. I would reverse the judgment of the district court and that portion of the court of appeal's decision that found "the 1979 lease included the right for Texas Brine to construct a replacement pipeline and this right is afforded to it under La. C.C. art. 642 as a right for the enjoyment of its personal servitude of right of use."[29] Agreeing with the court of appeal's finding of a trespass,[30] I would remand this matter to the district court for a determination of whether Texas Brine acted in bad faith by its unauthorized construction of a larger volume replacement pipeline and the extent of damages.

---

[29] **W&T Offshore, L.L.C.**, 17-0574 at 15, 250 So.3d at 979-80.

[30] *Id.*, 17-0574 at 17, 250 So.3d at 980.

**SUPREME COURT OF LOUISIANA**

**No. 2018-C-0950**

**CONSOLIDATED WITH**

**No. 2018-C-0956**

**W&T OFFSHORE, L.L.C.**

**VERSUS**

**TEXAS BRINE CORPORATION AND TEXAS BRINE COMPANY, L.L.C.**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF LAFOURCHE**

**CLARK, J.**, dissents.